CIRCUIT COURT. NOVEMBER 2, 1860.
EQUITY.

## LAURA KEENE *v.* WHEATLEY & CLARKE.

A party asserting her literary proprietorship of an unprinted comedy, under an assignment to her by its author, complained of its theatrical representation by the defendants, without her consent. It had been composed in England for performance at a London theatre. Difficulties of adaptation preventing its performance there, it was thrown back on the hands of the author. He, subsequently, not being a citizen, or a resident of the United States, for a valuable consideration, transferred his proprietorship of it for the United States to the complainant, a resident of New York, where she was the proprietor and manager of a theatre. She adopted measures for securing a copyright; and, in so doing, performed all such acts prescribed by statutes of the United States as were performable without a publication in print. The play, under her management, was adapted to representation at her theatre, with the assistance of an actor of her company, to whom the principal character was allotted; and, in the course of this adaptation, received written additions, underwent curtailment, and was otherwise altered. The additions were made or suggested by this actor. The play, as composed in England, or as thus altered, was never printed. As altered and adapted, it was publicly represented at the complainant's theatre. Here, the same actor, in performing the principal character, introduced, with a view to stage effect, some unwritten additions, relying for the repetition of them, upon his memory alone. The representation at the complainant's theatre having been successful, the defendants, proprietors, and managers of a theatre at Philadelphia, afterwards performed the play, against her will, at their theatre, imitating closely the general and particular performance of it, as it had been represented by her. They had witnessed its performance at her theatre; but this, whatever assistance it may have afforded them, was not the means of enabling them to represent it themselves. They obtained the contents of the English manuscript from a former copy, which had been unauthorizedly retained, or made, by a player at the London theatre for which it had been composed. The additions, written and unwritten, were, without the permission of the complainant, communicated to them by the same actor who had, under her management, introduced them at her theatre. It was *Held:*

1. That as the author was a non-resident alien, the complainant, though herself a resident of the United States, could not, as proprietor of the play,

sustain her suit upon the statutes of the United States for the protection of authors and their assigns.

2. But, independently of this legislation, the court, having, through the citizenship of the parties, a general equitable jurisdiction in the case, the suit was sustained.

3. The foreign author's assignment, if to be deemed a partial one, was, *at law*, inoperative, except as a license; but, having been for a valuable consideration, was, *in equity*, valid, as an assignment, for the United States, of such literary property as could exist in his composition.

4. The play never having been published in print, the complainant, as its literary proprietor, could have sustained her suit if she had not herself represented it theatrically before an indiscriminate audience.

5. A publication, literary or dramatic, may be limited or general. It is general, whenever the communication effecting it is not restricted, both as to the persons to whom, and the purpose for which, it is made. When general, it is a dedication to the public for such unlimited uses, including all modes of publishing and republishing, as it may be the means of directly or secondarily enabling any person to make. The complainant's prior performance of the play at her own theatre was a general publication. Therefore, if it had been the means of directly or secondarily enabling the defendants to represent it through a retention of its words in their own memory, or in that of others of her audience, her literary proprietorship could not have been so asserted as to enable her to maintain her suit.

6. But the literary proprietorship of an author and his assigns continues after a general publication, except so far as it may be the means of enabling others to make ulterior publication, or otherwise to use the composition published. Therefore, as the complainant's prior public performance of the play was not the means through which the defendants were enabled to represent it, her suit was maintainable on the foundation of literary property, notwithstanding such prior performance.

7. The written additions to the former manuscript were not independent literary productions, but *accessions* whose proprietorship was incidental to that of the principal composition.

8. Had this been otherwise, their literary proprietorship would have been in the complainant, and not in the actor who conceived and suggested them when he was in her service assisting her in adapting the drama to its intended first performance. His relation to her, as his employer, precluded him from acquiring, under such circumstances, an independent interest of his own in such products of his mental exertion in her service.

9. His *unwritten* additions were not capable of being the subjects of literary proprietorship in anybody. But, independently of any question of proprietary right, the complainant, having the advantage of her priority in the performance of this play, and being engaged in a professional competition in which the retention of this advantage would have been profitable to her, his communication to her professional rivals and competitors of the written, as well as unwritten, additions, was a breach of confidence on his part, from which a Court of Equity would not permit the defendants to derive an advantage to her prejudice, or to retain an advantage thus derived.

10. The additions, written and unwritten, and the incidental curtailments and alterations, having been the means by which the play, as a whole, was adapted successfully to dramatic representation, this equitable doctrine was, independently of any question of literary proprietorship, applicable to the whole play as acted by the complainant, and imitated by the defendants, including the former composition to which the additions were adapted, so far as it was retained.

11. In equity, an amendment of the bill, when allowed after answer and replication, does not open the pleadings unrestrictedly. The Court looks back through them in order to ascertain to what extent, if any, the amendment may have introduced a new case, or new matter; and, in general, considers them as open to this extent, but no farther.

12. An amendment of the bill, after answer, does not sanction the introduction on the part of the defendant, by way of plea, of an allegation of a personal disability in the complainant as having existed at the commencement of the suit. The answer itself would overrule such a plea.

## STATEMENT.

THIS was a suit in EQUITY for alleged infringement of copyright in a play. The bill appears, however, to have been framed with a view, also, to meet the broader question of what constitutes literary property at common law. The ground of the contestation and the facts as disclosed by the testimony are fully stated in the opinion. It is only necessary to add, preliminarily, for the more immediate understanding of the case, that the complainant's claim of ownership in the play rested upon an agreement to purchase, for valuable consideration, from Taylor, the author, made 29th September, 1858, carried into effect by an assignment executed by the attorney in fact of Taylor, dated 6th November, 1858. The defendants, claimed that, at the time of the purchase from Taylor, he had no title, having previously sold the play to Webster, who sold it to Silsbee, whose widow, after his death, became possessed of it as part of his personal estate, and who sold it to defendants.

At the time of filing the bill the play was in successful representation at the respective theatres of complainant and defendants. The prayer was to restrain the representation by defendants; for an account and payment of the proceeds of the performances, and for surrender of all parts, copies, or transcripts of the composition.

*John T. Montgomery,* for complainant.
*Constant Guillou,* for defendants.

## CADWALADER, J.

The comedy called "Our American Cousin" is described by
the defendants, in their answer, as a "piece presenting, in suit-
able situations, those eccentricities usually attributed on the
stage to Yankees." It was never printed, and has never been
published otherwise than through dramatic representation. It
was composed in England, in 1852, by a dramatic author
named Taylor, for performance in London at the Adelphi
Theatre, of which Benjamin Webster was the manager. Mr.
Taylor in that year sold it, or the right of performing it, to
Mr. Webster. Insuperable difficulties of adaptation prevent-
ing its performance there, it was thrown back on Mr. Taylor's
hands. In 1855 it again became his absolute property, under
an arrangement by which another drama of his composition
was exchanged by him, for it, with Webster. The manuscript
was then returned to him by Webster. As then written, it
was in two acts. Mr. Taylor afterwards changed its arrange-
ment by dividing it into three acts, and also made some trivial
changes in the text. The manuscript was then fairly re-
written by his wife. In the autumn of 1858, he, for a valuable
consideration, transferred all his literary and dramatic pro-
prietary rights in it, for the United States, to the complainant,
who is the lessee and proprietor of a theatre at New York. At
the close of September, 1858, she received from his agent at
New York the manuscript, in Mrs. Taylor's handwriting. In
the adaptation of the piece for its intended performance at the
complainant's theatre, she was assisted by Joseph Jefferson,
an actor of her company, whom the defendants describe in
their answer as a comedian of tact and talent. The principal
part in the play, called the Yankee character, was allotted to
him. The manuscript underwent curtailment and alteration,
and received additions. More than three-fifths of the dialogue
in one scene, and the fourth of another, were struck out, be-
sides the erasure of many passages in other scenes. The addi-

tions were chiefly in the character allotted to Mr. Jefferson. Those in this character, if not in the others, were made or suggested by himself. The curtailments and alterations, and some of the additions, were made with a lead pencil on the manuscript, which had been received by the complainant from the author. This manuscript having been written with ink, the author's composition, in the precise form in which he transferred it, is distinctly preserved. The manuscript was exhibited to him when he was examined in this cause, under a commission to London. He then deposed that these alterations, made since he parted with it, were in a handwriting unknown to him. After the return of the commission, the manuscript thus altered was proved, by a witness examined at New York, to be the one from which the piece was played at the complainant's theatre. Thus, in the text in ink we have the English composition, and in the writing in pencil we have some of the adaptations made under the complainant's management. The text in ink having been written on one side only of the paper, many of the pencil additions are on the former blank sides. They are, in other instances, written over pencil erasures, or interlined. The former text is nowhere obliterated or illegible. The manuscript contains references to other additions, as having been introduced at New York. These must have been written on other sheets, which have not been produced in evidence.

The play, when thus altered and adapted, was acted at the complainant's theatre, on the 18th of October, 1858. This was its first representation on any stage. The success of it was complete. Its performance was constantly repeated, with continued success, for many months.

The defendants are lessees and managers of a theatre in Philadelphia. They knew, between the 10th and the 17th of November, 1858, if not earlier, that the complainant asserted, under Mr. Taylor, as the author of this play, an exclusive literary proprietorship and sole right of dramatic representation of it in the United States. They were informed that she was willing, for a price named by her agent, to sell to them the right

of acting it in Philadelphia. One of them replied that they already had it, and intended to play it in Philadelphia. The manner in which they procured it has been since disclosed.

Joshua Silsbee, an American actor, was, in 1852, a performer in Mr. Webster's theatrical company at the Adelphi Theatre in London. In 1852, Mr. Taylor, the author, was told by Silsbee that he had a copy of the manuscript in his possession, for the purpose of studying the Yankee character. Mr. Webster, then the proprietor of the play, deposed that he never gave to Silsbee a copy, or permission to have one; and that, if he had one, he must have obtained it surreptitiously. The defendants allege, in their answer, that the parts in the play were cast in England, when this character was allotted to Silsbee, whom they describe as capable of imparting to its those *peculiar features and touches* upon which the success of the play would, in a great measure, depend. · They also allege that the piece was rehearsed at the Adelphi Theatre in 1852, preparatorily to its intended performance there. These allegations appear to have been founded altogether in error. ·The evidence is very distinct that it never was rehearsed in England. There is no evidence that anything was done with a view to its intended rehearsal, or that the characters were, in whole or in part, even provisionally cast. They cannot, consistently with the evidence, have been *definitively* cast with Mr. Webster's concurrence. They possibly may have been provisionally, or conjecturally, cast by somebody, perhaps by Mr. Silsbee, who, as a performer at that theatre, expected to act the Yankee character, if the play should be represented there. But, according to Webster's testimony, strengthened by that of Taylor, no part in the piece was ever allotted to Silsbee, or to any other actor in Webster's company. Mr. Webster, as manager, was very strongly of opinion that Mr. Silsbee was incapable of performing the Yankee part with success. He had frequently failed at that theatre in such parts. In this unfavorable opinion, Mr. Taylor, the author, decidedly concurred. On this point, if the testimony had been impeached, it would have been confirmed by two letters of the year 1852, from Taylor to

Webster, concerning the difficulties of adapting this character to the capacity of Mr. Silsbee, or of any other performer at the Adelphi Theatre. This appears to have been a chief cause of its non-performance there. A copy of the manuscript must, however, have been in Mr. Silsbee's possession, and have been retained by him. His possession of it, if ever known by Webster, must have been overlooked, and afterwards forgotten. Silsbee returned to the United States, bringing it with him, and subsequently, in 1855, when still in possession of it, died in California. It passed, after his death, into the possession of his widow, who subsequently became the wife of William Chapman. Mrs. Chapman has not been examined by the defendants as a witness, though the principal allegations of their answer must, if true, have depended upon information which cannot, probably, have been derived from any other person. Of the truth of these principal allegations, they cannot have had any direct knowledge of their own. There is no evidence that Mrs. Chapman's attention, or that of any one else in the United States, was attracted to the copy of the manuscript in her possession, until after the public announcement, at New York, of the intended performance of the play at the complainant's theatre. There is no reason to believe that the existence of this copy was known to the defendants until after this announcement, or, indeed, until after the successful representation of the piece at her theatre. All that we really know concerning the copy is, that it passed, at about this time, into the possession of the defendants from that of Mrs. Chapman, and that Mr. Silsbee, her former husband, had obtained possession of it when he was a player in Webster's company. The defendants now claim, as will be stated hereafter, a right of using this copy under a title which, they assert, was vested in Silsbee. As they assert this claim, his own statement, that he had possession of it for the purpose of studying a part in it, is evidence against them of the purpose for which he obtained the possession. The statement might have been true, though the parts were not cast, nor any definitive allotment of this part made. The inference from the testimony least unfavorable to his

memory is, that he may have thus obtained the copy in the
first instance, and that his retention of it was afterwards over-
looked, or disregarded. We cannot, upon the testimony,
believe, or assume, that he retained the possession of it with
any direct permission from Webster. But such permission,
had it been obtained, would not have authorized Silsbee,
if living, to make any public use of the copy, or to sanction
any such use by others. Of course, no party coming, after
his death, into possession of it under him, could give a legal
sanction to any such use of it by the defendants.

After they had obtained this copy from Mrs. Chapman, the
defendant Clarke procured from Mr. Jefferson the additions
which he had, under the complainant's management, intro-
duced into his performance of the principal character.
Whether Mr. Jefferson, besides the written additions to it
which have been mentioned, introduced others which have
never been written, relying, for the repetition of them, on his
memory alone, is involved in some uncertainty. But if his
additions were both written and unwritten, they were all, ac-
cording to the proofs, communicated by him to the defendants
and introduced by them into their performance of the play.
One of the complainant's interrogatories required the defend-
ants to state fully what language or words Mr. Clarke thus
obtained from Mr. Jefferson. Instead of making the state-
ment thus required, they merely offered in their answer to state
"all and singular the language or words" communicated if
they should afterwards be required so to do. This offer does
not entitle them to derive any benefit from their omission to
make the disclosure. But, the complainant, not having ex-
cepted to the answer, cannot use their omission to supply any
defect in her own proof. Their offer to make the statement
shows, indeed, that nothing communicated by Mr. Jefferson
was thought so unimportant as to have been lost by them for
want of a memorial. That what he communicated to them
included any additions which had not been previously written
for the complainant is improbable. But it may nevertheless
be true. If it be so, the written and unwritten additions must

have been combined in the production of dramatic effect. If the defendants can, in any view of the case, derive any benefit from an assumption that some of them were unwritten, the assumption should be made unless an inquiry by a master to ascertain the precise truth be directed. Such an inquiry will be dispensed with by assuming that some of the additions were unwritten. This assumption will, however, be made so far only as it may benefit the defendants. We will hereafter see that the decisions will, upon this view of the facts, be the same as if the additions were all written. But under one head the reasoning will not be the same.

The defendants, by thus obtaining the manuscript from Mrs. Chapman, and the additions from Mr. Jefferson, having enabled themselves to represent the play as it had been adapted and brought out by the complainant, announced its intended performance on the 22d and 23d of November, 1858, in a playbill headed: "First nights of the great new Comedy by Tom Taylor, author of 'Still Waters Run Deep,' etc., entitled *Our American Cousin,* now in the sixth week of its brilliant and triumphant career in New York. It will be presented after *several weeks of most careful preparation."* It was performed according to this announcement, each of the defendants acting a part in it, the defendant Clarke performing the Yankee character with Jefferson's adaptations. The defendants performed the piece repeatedly afterwards, with profitable results.

Before their first performance of it, each of them, and the actress of their company who performed the principal female character, had witnessed the performance at the complainant's theatre. But they were not enabled to represent it at their own theatre through any impression of the words on their memory, or on that of any of the audience who had attended the complainant's performances. The proof is, on the contrary, distinct, that the words were obtained by them from the manuscript procured from Mrs. Chapman, and through the communication, by Mr. Jefferson, of the additions.

The above quotation from the defendant's playbill indi-

cated that their purpose was not an independent representation of the play so much as a repetition of its performance at New York. Their effort was to imitate this performance as closely as possible. That they succeeded in producing a very close imitation appears from the testimony. A person engaged at the complainant's theatre, in her constant employment, who had very often seen the play performed there, and says that he was familiar with it, was present at the defendant's theatre on the first night of its performance in Philadelphia. Their playbill, already mentioned, containing a synopsis of the scenery and incidents, under more than one hundred heads, was before him. He deposes that he knew the play, word for word, as the performance went on. According to his testimony, the particular scene already mentioned, of which more than three-fifths had been expunged by the complainant, was wholly omitted by the defendants in their performance; but, except in this omission, the performances at each theatre were the same, or similar. Two particular instances, confirmatory of this evidence, may be regarded as characteristic of the imitative purpose of the whole performance. We have seen that, long after Mr. Silsbee left England, the arrangement of the play was changed by dividing it into three acts. The manuscript which he took away must have been that of a play in two acts. The defendants' playbill shows that they adopted the change of arrangement by making the division into three acts; and their cross-interrogatories for the commission to London indicate their vigilance in observing this, and a minuter nonconformity in the texts of the manuscripts. The other instance was in one of the adaptations at New York. The words "Pontiac, Michigan," had been there struck out from the English manuscript, and "Brattleboro', Vermont," substituted with a pencil. Where this first occurs in the complainant's manuscript, the defendants' playbill, in describing the scene, contains the words "Brattleboro', Vermont."

Thus, at each theatre, the play, as acted, was the English author's composition adapted by the complainant, with Jef-

ferson's additions, and some curtailments and alterations, to the stage in the United States. The defendants appear to have been careful to secure to themselves, before performing it, the means of acting it, as a whole, comformably to the method of its previous representation by the complainant.

She instituted the present proceeding in November, 1858, alleging an exclusive right in herself under the above derivation of title, and the statutes of the United States for the protection of general and dramatic literary property, and praying an injunction to restrain the defendants from representing the play, and an account of the profits, etc. When the piece was in the course of successful performance at both theatres, an application for a preliminary injunction was heard upon affidavits and counter affidavits. Upon a deposit by the defendants of a sum of money equal to the amount for which the complainant had been willing to license its performance by them, with a sufficient addition to cover costs, the court refused to grant an injunction in the primary stage of the cause.

It was afterwards heard upon bill, answer, and replication, depositions and papers read, and admissions.

The defendants, notwithstanding the public declaration in their playbill that Mr. Taylor was the author of the comedy, asserted in their answer that it was of the joint authorship of himself and Mr. Silsbee. Admitting that Mr. Taylor's right and interest were transferred by him to Mr. Webster in 1852, they alleged that Webster, afterwards, for a valuable consideration, assigned it absolutely to Silsbee, who bequeathed his personal estate, in which it was included, to his widow, now Mrs. Chapman. They asserted that her present husband, for a valuable consideration paid by them to her, licensed its performance by them, and delivered to them the manuscript, which they say was the original one. They have adduced no evidence of the alleged bequest, or subsequent license, or of the payment of the alleged consideration. The assertion of Webster's transfer to Silsbee is not only unsupported by proof, but is directly contradicted by the

testimony. The depositions of Mr. Taylor and Mr. Webster, moreover, entirely negative Silsbee's alleged participation in the authorship; and show that the play was composed exclusively by Taylor, in whom, as we have seen, the proprietorship of it was revested in 1855.

One of the interrogatories of the complainant's bill required the defendants to state fully, when, where, and how, they had obtained possession of this comedy, and how they claimed the right of representing it. Any technical operation in their favor of their own allegations responsive to this and other interrogatories of the bill is removed by the contradictory testimony which has been reviewed. Their answer, which has rendered this review necessary, is of no technical force against such evidence; and not having been founded, as to the most material points, upon any possible knowledge of their own, is of no moral opposing force.

If Mrs. Chapman was the duly qualified representative of Mr. Silsbee's estate, and, with her present husband, licensed the performance of the play by the defendants, the license was of no effect whatever. Of this the defendants would seem to have been, at the time of the hearing, fully aware. They did not attempt to verify any writing as a manuscript, or copy of the manuscript, of the play, or offer any such writing in evidence. They thus wholly failed in their endeavor to show that they had rightfully represented the play from the manuscript, or that any copy of it had ever been rightfully in their possession.

The defence was confined, at the hearing, to a denial of the complainant's right of maintaining her suit under the acts of Congress for the protection of literary property, or independently of those acts.

The consideration of the acts of Congress may be prefaced by the remark that the word *copyright*, and phrase *literary property*, though sometimes confounded, are not synonymous. The latter phrase has a more general signification than *copyright*, which signifies an exclusive right of an author

and his assigns to *print* his literary composition, and publish and republish it in print. A legislative enactment securing generally to literary proprietors a copyright for a limited period, but containing no special provision as to theatrical representation, does not, in the case of a dramatic literary composition, include the sole right of such representation. This, which the course of legislation on both sides of the Atlantic implies, was decided in Coleman *v.* Wathen, (5 D. & E. 245,) and Murray *v.* Elliston, (5 Barnw. & Ald. 657,) cited and remarked upon in 12 Ad. & El., N. S. 236, and 2 De G. & Sm. 675, 692. In the absence of any legislation for the special protection of dramatic literary property, an authorized public circulation of a printed copy of a drama for which there is a legislative copyright is a publication which legalizes an optional subsequent theatrical representation by anybody from such copy. But the mere adoption of the measures by which such a copyright may be secured has no such effect unless their adoption has been attended or followed by an actual publication in print.

The complainant had adopted the usual measures to secure to herself a statutory copyright for the United States. In so doing, she had observed all the statutory regulations on the subject, except the direction that a copy of the book be delivered to the clerk of the proper court within three months from the time of its publication. The intended meaning of the word *publication,* in this and other statutory provisions concerning copyright, is publication *in print.* The period, therefore, from which the three months would be computable, is not arrived. The complainant had thus observed every direction which could be complied with in the case of an unprinted book.

So far as any question under the acts of Congress was concerned, the *citizenship* of the *parties in the cause* was immaterial. The act of 15th of February, 1819, gives to the Circuit Courts original cognizance, as well in equity as at law, of all cases "arising under any law of the United States, granting or confirming to authors or inventors the exclusive

right to their respective writings, inventions, and discoveries."
This act concerns remedies, and not rights. Under the
statutes which confer and regulate *rights* of literary proprietor-
ship, the citizenship of the *parties litigant* was also unim-
portant. It sufficed, under these acts, that the complainant
was a *resident* of the United States, which was undisputed.
The difficulty in her way was that Mr. Taylor, the *author*
through whom her title was derived, was a *non-resident alien*.
This difficulty presented the only question under the acts of
Congress requiring particular consideration.

The act of 3d of February, 1831, repealed, with a saving
of privileges then existing, the prior statutes concerning rights
of literary property. The 9th section of this act, giving
redress for the unauthorized *printing* or *publishing* of *manu-
scripts,* operates in favor of a resident of the United States,
who has acquired the proprietorship of an *unprinted* literary
composition from a non-resident alien author. But the word
*publish* here again means publish *in print*. This—which is
the only section enabling a proprietor, who derives his title
from such an author, to assert any right under the act—gives
no redress for an unauthorized theatrical representation. The
other sections concern copyright. They apply only to authors
who, if not citizens, must be residents of the United States,
and proprietors under derivations of title from *such* authors.
No other proprietor can obtain a copyright under the act.

The only statute which affords redress for unauthorized
theatrical representations is the act of 18th of August, 1856.
This act applies only to cases in which copyright is effectually
secured under the act of 1831.

Therefore, the complainant had no statutory right of
redress.

The remaining inquiry was, whether her suit could be sus-
tained, independently of any legislation concerning dramatic
or other literary property.

Under this head, as the defendants were citizens of Penn-

sylvania, the general equitable jurisdiction of the court could be exercised if the complainant was a citizen of another state, or an alien.

At the commencement of the suit she was an alien, residing at New York. But she had previously filed a declaration of her intention to become a citizen of the United States. During the pendency of the suit, and before the hearing, she was naturalized. She was described, in her bill of complaint, as a citizen of the State of New York. This description of her, though correct at the time of the hearing, had not been correct when the bill was filed. She should have been described in it as an alien. As the jurisdiction of the court was maintainable under either description of her, if true, the mistake was of such a character that an amendment correcting the misdescription would, of course, have been allowed, whenever asked. The case was heard and considered as if such an amendment had already been made.

The complainant insisted that, as the play had never been printed, her literary proprietorship of it entitled her to maintain the suit, independently of any statute.

The author's proprietary rights for England and Scotland had never been transferred to her. The statutes of the United States for the protection of authors do not, like those for the benefit of inventors, expressly sanction transfers of limited local proprietorships of exclusive privileges. A writing, which is, in form, a transfer by an author of his exclusive right for a designated portion of the United States, would, therefore, *at law,* even under the statutes of copyright, operate as a mere *license,* and would be ineffectual as an assignment. (10 How. 194; 1 Wall, Jr., 339; 17 Com. B. 436, 437.) Whether an assignment by a *foreign author* of his whole right, for the entire United States, would fall within the same rule, is a question which might be discussed, if such an author could acquire a copyright, or by transfer, impart the privilege of acquiring one. (See 4 H. L. Ca. 992, 993, 940.) In the present case, where the foreign author had no statutory pro-

prietorship, and could impart no privilege of obtaining one, his transfer to the complainant cannot be regarded otherwise than as only a partial assignment, upon which a suit could not be maintained at law in her own name.   But, in a proceeding like the present, in equity, a limited local, or other partial assignment, if made, for a valuable consideration, by a person whose transfer of the whole interest would have passed the proprietorship, is carried into effect, whether it would have been effectual or not, at law.   (3 Jur. 219; 11 Sim. 572; 5 Peters, 602; 3 Swanst. 393; 4 Mylne & Cr. 702, 703; 7 Sim. 109.)   The complainant, therefore, does not, in this court, stand in any respect on a less favored footing than an *author*. That her asserted literary proprietorship is derived under one who was a non-resident alien does affect her case, considered independently of the statutes.

Here, we may remark, that the literary proprietorship of the principal composition included that of the additions to it which have been described as written, in pencil, on the complainant's manuscript, and of such other additions as may have been made in writing.   These additions, as *literary accessions,* were incapable of independent proprietorship.   (Hatton *v.* Kean, 29 L. Journ. N. S. Com. Pls. 20; 7 Com. B. N. S. 268; Pothier Propriété, 170 to 175; Code Nap. 566, 567; and see the citations of other modern European Codes in Saint Joseph's Concordance.)

The rules of the law of accession, which have been thus applied, are applicable in favor only of such innocent parties as have not wilfully used the property of others.   A wrongdoer can derive no benefit from the otherwise accessorial character of that which he converts to his own use.   The publication of books may thus, for literary piracy, be suppressed, when the pirated matter is accessorial only to former compositions for which there could be no copyright, and constitutes only a very small proportion of the whole contents. Thus, as against a wrongdoer, that which is an accessorial part of a whole, may be regarded as a material, or even vital, part.   (3 Swanst. 680, 681; 5 Ves. 709, 16 Com. B. 459; 3

Mylne & Co., 738, 736, 737.)   The distinction will hereafter be found important.

In whose handwriting the additions were, does not appear, and is not material.   That they were conceived and suggested, if not written, by Mr. Jefferson when engaged in assisting the complainant in bringing out the play, is indisputable.   If their accessorial character could be excluded from consideration, his relation to her as his employer would have rendered him incapable of acquiring in them an independent proprietorship of his own.   The duties of theatrical performers to their employers are, in this respect, like those of artists retained under a standing engagement in any other professional service. Where a female opera singer had engaged with a theatrical proprietor to sing for three months at his theatre, and not sing elsewhere during that period, without his consent, Lord St. Leonards said:   "The engagement to perform for three months at one theatre must *necessarily* exclude the right to perform at the same time at another theatre.   It was clearly intended that" she "was to exert her vocal abilities to the utmost to aid the theatre to which she engaged to attach herself."   He was "of opinion that if she had attempted, even *in the absence of any such negative stipulation,* to perform at another theatre, she would have broken the spirit and true meaning of the contract as much as" in the case of "the contract into which she" had "actually entered."   (1 De G., Macn. & G. 618, 619.  See 6 De G., M. & G. 230.)   A calico printer discharged his head colorman, who sued him in trover for a book of entries of processes of mixing the colors used in his business.   The book had been kept by the plaintiff while in the defendant's employment.   It contained entries of many processes which were of the plaintiff's own invention.   The decision was that he could not recover.   Heath, J., said that though there might be inventions of the plaintiff in it, yet they were the property of the master.   Chambre, J., said that the master had a right to something beside the mere manual labor of the servant in the mixing of the colors; and though the plaintiff invented them, yet they were to be used for his

master's benefit. (4 Taunt. 770.) If it be suggested that literary addition, or adaptation, is no part of the general duty of dramatic performers, and that there is no particular exception in the case of an unprinted play never before performed, the objection may, in this case, be disposed of without considering the question suggested. Here, Mr. Jefferson, while in the general theatrical employment of the complainant, engaged in the particular office of assisting in the adaptation of this play; and made the additions in question in the course of his willing performance of this duty. She, consequently, became the proprietor of them as products of his intellectual exertion in a particular service in her employment. Where an inventor, in the course of his experimental essays, employs an assistant who suggests, and adapts, a subordinate improvement, it is, in law, an incident, or part, of the employer's main invention. (1 Com. B. 551.) In a case of a musical composition, a person who adapted words to an old air, and procured a friend to compose an accompaniment, acquired a copyright, both in the words and the accompaniment. (7 Com. B. 4.) The direct application of the principle to literary compositions, their parts, additions, and accessions, is too familiar to require more than a reference to some of the authorities. (2 L. Journ. Ch. 90, 2 S. & S. 1; 16 Com. B. 459; 3 Jur. 219; 5 Carr. & P. 58; Merlin Questions de Droit, "Contrefaçon," § II, vol. 2, p. 659; "Propriété Literair," § II, vol. 6, p. 498, 4th ed., and Hatton v. Kean, cited above.)

Therefore, so far as the question of literary proprietorship, independently of the statutes, may be concerned, Mr. Jefferson's written additions will require no separate or distinct consideration.

The play having never been printed, the complainant, as its literary proprietor, could, independently of the statutes, have maintained her suit, if the defendants' theatrical representation of it had not been preceded by her own. If the previous performance of it at her theatre had been the means of enabling the defendants fairly to bring it out at their theatre, the suit

could not have been maintained. But the point for decision was, whether her prior performance, as it had not been the means through which they were enabled so to do, defeated her suit.

Under the peculiar circumstances of the case, this point could, as I thought, and still think, be decided independently of any question of literary proprietorship. In the administration of equitable jurisprudence, improper disclosures of the knowledge of primary results of mental development, whether the contents of literary compositions, or oral discourses, or secrets of inventors, or improper disclosures of knowledge acquired in professional relations, or in those of service or agency, are prevented and redressed on principles of general applicability. (3 Law Journ. Ch. 209, 213, 219; 1 Hall & T. 28; 2 De G. & Sm. 652; 1 Hall. & T. 1; 1 Macn. & G. 25; 7 Pet. 317 to 322; 2 Bos. & Pul. 630, 577, 578; 2 Mees & W. 558 to 560; 2 Meriv. 450, 451; 1 Vern. 61; 3 Meriv. 157; 1 Jac. & W. 394; 1 Sim. & Stu. 398; 9 Hare, 241, 267; 21 L. Journ. Ch. N. S. 248; 9 Eng. L. & Eq. 182; 9 Sim. 196; 10 Sim. 135; 15 Sim. 378; 1 Hall & T. 116; 2 Phillips, 777, 778.) In the exercise of this equitable jurisdiction, rights founded in personal and professional relations of *confidence* are protected independently of any question of the existence or continuance of *proprietary right.* Preventive protection under this head is afforded in proceedings against persons not themselves parties or immediate privies to the breach of confidence, A person who has not acquired through it an independent subsisting equity of his own, is not permitted by a court of equity to derive any benefit from it, or retain any benefit so derived.

In the present case, the complainant has acquired all such rights in the principal composition as were formerly Webster's. The defendants' assert in it no right, except as derived under Silsbee. The case, therefore, as to the copy of it which Silsbee had, is the same as if Webster and Silsbee were now the

litigants. The defendants have used this copy, though Silsbee had no possession of it except for use in his professional service to Webster. They procured Mr. Jefferson's additions through his breach of professional duty to the complainant as his employer. As to these additions, the direct breach of confidence was between Jefferson and the complainant. But, according to many of the authorities which had been cited, the defendants, having procured, or availed themselves of, Mr. Jefferson's violation of his duty to the complainant, stand, in respect of it, in his place. We have seen that theatrical performers, in the relation of Silsbee to Webster, or of Jefferson to the complainant, owe to their employers no less fidelity than artists, or agents, retained in any other permanent, or temporary, professional service.

Though the complainant's literary proprietorship of the play in question had not been sustainable, she had the only manuscript from which a first performance of it could be lawfully made. Having the advantage of this priority, she was known to be desirous of retaining the exclusive dramatic representation of the piece. In any competition with professional rivals, this priority, and the possession of the manuscript, gave to her a fair advantage, which, without any literary proprietorship, might have been retained for some time, if not indefinitely. In regulating the police of her theatre, she could have prevented reporters from taking down the words of the play during its performance, and could have excluded persons unwilling to acquiesce in such conditions. (Ambl. 694; 17 Cobb. Parl. Hist. 1094; 2 De G. & Sm. 692; 13 M. & W. 838.) The only fair means by which others could have obtained the words, were, through their impression upon the memory of some person whose constant attendance at her performances of the play might, at length, enable him, elsewhere to repeat or to write out its language. If, through such attendance of one or more persons, the words of unprinted plays could be obtained accurately, the method of obtaining them would not be expeditious or economical. Its adoption has not, in modern experience, been usual. The de-

fendants, as the complainant's professional rivals, did not compete fairly with her when they used any other means of abridging the duration of her legitimate advantages. This remark applies, at all events, to the means which were, in fact, used.

The remark might, under proper pleadings, have been applicable to the use both of the copy which Silsbee had retained, and the additions which the defendants procured from Jefferson. The case would then, upon the merits as disclosed by the answer and proofs, have been a simple one. But, the complainant's bill is not so framed, that she can, independently of the question of literary proprietorship, obtain a decree founded upon the defendant's use of the copy retained by Silsbee. The bill contains no averment of the surreptitious, or other, former, or present, possession by any one of a copy of the manuscript, or of the use by the defendants of such a copy. Except the averment that the defendants represented the play publicly without the complainant's consent, and the interrogatory quoted above, the bill contains nothing on the subject. A decree for a complainant cannot be made upon a fact not averred in the bill, though it may be disclosed in the defendant's answers to the interrogatories of the bill. (3 Swanst. 687, 689; 10 Wheat. 188; 1 Pet. C. C. 383, 384; 1 Gall. 385, 386; 3 Barb. Ch. 51.) The complainant, when this objection was taken, had an opportunity to amend her bill in this particular, but made no application for the purpose. The only advantage to her, therefore, of the disclosures as to the copy retained by Silsbee, and the use made of it, is in the proof which these disclosures afford that the defendants were not enabled to represent the play merely from its having been publicly performed at her theatre. Whether, on the footing of literary proprietorship, this would suffice to sustain her suit, is not at this moment, the question. Independently of such proprietorship, her suit cannot, upon this bill, be sustained on the mere ground of the improper use of this copy.

The complainant is, however, under no such difficulty as to the improper use of the additions procured from Jefferson.

Her bill avers that the defendant Clarke obtained the principal parts and the language from Jefferson, who was in her employment as an actor, and who performed one of the characters in the comedy. Though her claim of an exclusive right had not been sustainable, she was entitled, in her competition with professional rivals, to the co-operation and support of every person employed by her within the walls of her theatre. The implied confidential restriction which ought to have prevented the disclosure of the words of her new play by performers of her own theatrical company, was of the greatest importance to her in this competition. Yet, Mr. Jefferson communicated his additions to Mr. Clarke, who introduced them into his own performance. The unwritten additions, which may have been included, could not be the subject of literary proprietorship. But the equitable jurisdiction which we are now considering is exercisable on grounds which are independent of proprietary right in the party injured, or in any other person. The jurisdiction has been thus exercised in the cases of an oral didactic lecture, and of an unpatentable or unpatented invention. (3 L. Journ. Ch. 209; 9 Hare, 241, 258, 259.) The doctrine in question applies, therefore, alike to the unwritten and written additions, whether those in writing were the subject of literary proprietorship, or not.

If the success of the play is attributable, in any principal degree, to the additions, alterations, and curtailments, by which it was adapted at New York to dramatic representation, the same equitable doctrine applies to it *as a whole*, just as it was acted there, including the former composition so far as retained, and the additions, written and unwritten, if any of them were in truth unwritten. This brings us to the inquiry, how far the additions, as the particular subject of Mr. Jefferson's breach of his duty, should be regarded as having had a principal, as distinguished from a subordinate and insignificant influence, in causing the success of the performance. If they cannot safely be rejected from consideration as trivial and insignificant, both in their *character* and in their *effect*, the cause may be decided on the ground of breach

of confidence, independently of the question of proprietary right.

With reference to this play, the defendants describe such "assistance and authorship" as their answer attributes to the late Mr. Silsbee as "invaluable." Their language, though, so far as the play is concerned, misapplied as to *him*, tends to define the particular character of it as a drama. The language seems to have been less inapplicable to Mr. Jefferson, of whom, as a member of the complainant's company, the talent and experience were, or should have been, at her command. Nevertheless, their answer in certain passages has a tendency to disparage Mr. Jefferson's assistance to them, as though the additions or adaptations obtained through it had been of trivial value. These passages of the answer are, however, inconsistent with other statements in it, and are contradicted by the defendants' own conduct, in procuring and using the adaptations. This conduct precludes them from denying, with any fair show of reason or justice, that for the purpose of adapting the play favorably to the stage, the additions, curtailments, and alterations were improvements at least upon the author's composition. That they probably diminished some difficulties which had prevented the play from being acted in England, and removed objectionable features which, for local reasons, would have prevented the success of it in the United States, is perhaps not stating the case in its full strength. As the play was performed, the success of it, as a whole, was complete. But from what occurred in England and in this country, we may infer that its performance without the adaptations might have resulted in a failure. The author's manuscript had, in England, been cast aside for six years. In all this time, the copy which Mr. Silsbee had retained was unthought of and useless. The defendants having this copy in their possession, with no scruples as to using it, had not been willing to act the play from it, without the New York adaptations. The plot was not theatrically novel. The success of the piece was dependent upon the scenery and incidents, and the viva-

city and humor of the dialogue. Mr. Hallam, following a
suggestion of Collier, thinks that, in modern theatres, the use
made of scenery has diminished, in certain cases, the necessity
for exercising the creative powers of a dramatic author's
imagination. Such may be the case peculiarly with a light
piece of this class. The synopsis of scenery and incidents in
the play-bill shows that this was, in the opinion of those who
brought it out, not less important than the dialogue. To
these arrangements, however, the dialogue required adapta-
tion. Some of the additions in pencil to the author's manu-
script indicate a self-confident, but not imprudent, boldness,
which probably was the result of a combination, in Mr. Jef-
ferson, of histrionic talent with a matured experience in the
production of comic effect. We, however, cannot estimate
their importance or value from anything so surely as from
the conduct of the parties and the success of the play.
Schlegel asks, "How does a dramatic work become theat-
rical or fitted for the stage?" and answers, "In single in-
stances it is often very difficult to determine whether a work
possesses such a property or not. It is, indeed, frequently
the subject of great controversy, especially when the self-
love of authors and actors comes into collision. Each shifts
the blame of failure on the other." He says of "theatrical
fitness," that much must "always depend on the capacities
and humors of the audience, and, consequently, on the na-
tional character in general, and the particular degree of
mental culture." In a certain line of the dramatic profession,
a particular actor, or stage manager, or assistant, may be en-
dowed with a peculiar faculty for the adaptation of a piece
to such humors and capacities. For a drama like that in
question, Jefferson may have possessed this faculty. Whether
the defendants could, without his assistance, have been able
to bring out the piece at their theatre with any probability of
success, is thus an inquiry which cannot be safely prosecuted
with a view to an *absolute* answer. That they availed them-
selves of his aid suffices to convince us that they could not
have otherwise brought it out with an *equal prospect* of suc-

cess. Here the question is not so much what number of words he communicated, or what the words were, or what was their *character*, as what *effect* they produced. The purpose of the defendants is, moreover, to be regarded. We have seen that it would not have been attained by a partial or incomplete imitation of the play as it had been successfully brought out by the complainant. Their purpose was to bring out at their theatre a complete imitation of it as a whole. By taking advantage of the breach of confidence committed by Mr. Jefferson, they enabled themselves to effect this purpose. His additions were, therefore, so far as the defendants were concerned, not a secondary, but an essential, part of the play as performed.

But, according to the defendant's answer, these additions were *principally* gags and minutiæ of stage effect, *most* of them old and well known to the dramatic profession, and a very *small proportion* of them original. The language of the answer imports that they were *not wholly* of the character thus described. The defendants' counsel, relying, however, upon the general tendency of its language, has urged that the effect of such adaptations and additions, in promoting the success of the play, must have been insignificant. There is no safe, legal, or equitable standard by which effects of wrongful acts, can, in general, be thus qualified or apportioned for the benefit, or exemption, of parties or privies to their commission. The foregoing reasoning has, in favor of the defendants, already, perhaps, too much relaxed the salutary rigor of the rule which, in general, prevents wrongdoers from succeeding in attempts to apportion, for their own benefit, the unknown consequences of such acts. The result of this case would not be varied if we could safely assume, as, however, we cannot, that the additions consisted principally in mere adaptations of *gags* which, as formerly applied in other plays, were already familiar to persons of experience in the dramatic profession.

A gag, in dramatic language, is a word, a sentence, or a passage of two or more sentences, not in a drama as com-

posed by the author, but interpolated, and uttered on the stage by the player. Gags, in general, are violations of dramatic propriety. But, theatrical regulations which prohibit them are not always enforced with strictness, and are sometimes much relaxed as to comedians in public favor. Sometimes gags are sanctioned by the manager's approval at the rehearsal of a play. They are, occasionally, in comedies of the lighter kind, licensed more or less, if not encouraged, by dramatic authors, who attend rehearsals of their own plays. In England, as the testimony proves, these authors, after the characters have been cast, frequently, before any rehearsal, read their plays, in the manager's presence, to the company of performers. On these occasions, or at rehearsals, gags may be sanctioned by both author and manager. Sheridan, when he was author and manager, probably sanctioned some of the gags with which one of his most popular pieces has, to this day, been usually performed. In the play now in question, where the first scene closes on the characters gathered around the Yankee in England, who asks whether they will have "a cobler, or a julep, a gin-sling, a cock-tail, or a chain lightning?" the author, in his manuscript, adds, "winds up, with a catalogue *ad libitum* of the names and merits of American drinks." To exclude gags fastidiously from other parts of such a play as this would oppose the apparent tendency of the author's own plan of its representation. A strict adherence to his written dialogue would, probably, therefore, in many of the scenes, have been, even in his opinion, less useful than some of Mr. Jefferson's additions. The judicious introduction by a comedian of his "tact and talent" of gags happily adapted for the production or improvement of stage effect, may have prevented the failure, or greatly promoted the success of the play.

The defendants' remark that the gags " were *mostly* old, and well known to the" dramatic "profession," if it had been made with any specified application, and had been verified by proof, would have been of no importance. The judicious introduction of matter whose chief or only novelty consists

in its happy *adaptation* to the production of stage effect, may contribute more to that popularity of a light comedy, which secures profitable repetitions of its performance, than polished wit, refined humor, or classical or courtly sarcasm. Literary *adaptation* is legally recognized as a distinct branch of the dramatic author's profession. It varies in degree from that *aid* which is the mere accessory of another's work to that *production* which constitutes absolute authorship. (17 Com., B. 427; 7 Com., B. N. S. 268; 29 L. Journ., N. S. Com. Pls. 20.) The success or failure of a play may depend upon that which is only accessorial, or upon dramatic adaptation which is not even literary. Modifications of assistance to dramatic effect may be various, almost infinitely so. Most important aid may sometimes be furnished by the repetition, with a new application, of that which has, under other theatrical circumstances, been said or done before. The extent or value of the benefit which may be derivable from such adaptations cannot always be measured very precisely, for practical purposes, by any standard of mere literary criticism.

In the case of a drama which has been printed and published, the subsequent approval of a gag by the manager of the only theatre at which the drama has been represented, and the sanction or adoption of the same gag by the author, will not render it, as a legal accession, a part of his dramatic literary composition, though it has been, with his concurrence, inserted in writing in the manuscript from which the drama was, before such insertion, printed. Much less can ordinary gags, not thus inscribed or sanctioned, become accessions to the composition. If *unwritten* gags could be a subject of proprietary right, as they never can be, they would, as between the dramatic author and the player uttering them, be the player's. As between such a player and the manager or proprietor of the theatre at which he is engaged, if the drama has already been published in print, or, though unprinted, has been so represented on different stages that there is no theatrical rivalry, or competition for its exclusive performance, the friendly communication of the gags by

the player to members of his profession engaged at other theatres, would not, in ordinary cases, violate any confidence resulting from his implied conventional relations to his own employer. The defendants, in their answer, say, that among players interchanges of such professional courtesies are usual. They may not be improper in such ordinary cases. But this was, in every respect, a different case.

I was, therefore, of opinion that the means used by the defendants to enable themselves to imitate the complainant's performance of the play had been such as to entitle her to a decree, independently of the question of her literary proprietorship, on which I avoided the expression of an opinion.

If the defendants, in taking advantage of Mr. Jefferson's breach of duty to his employer, had been innocent parties, not aware of his confidential relation to the complainant, the jurisdiction of the court, so far as exercisable independently of her literary proprietorship, would have been preventive only. As, however, they were privies to and participants in his breach of confidence, if not the procurers of it, they were liable to make her pecuniary compensation. But, though the jurisdiction had been merely preventive, the fund in court would, in this case, have been answerable for the complainant's indemnity. Her application for a preliminary injunction was refused upon the deposit of this money to secure to her an indemnity if the defendants' continued performance of the play should be adjudged a violation of any right entitling her to an injunction. The defendants having continued its performance, this fund is answerable for all damages, not exceeding its amount, sustained by her from such continuance. Out of the fund, she is thus entitled to pecuniary relief, independently of any question of the defendants' privity to the breach of confidence, and independently of any question of her own literary proprietorship.

The amount of this fund was fixed with reference to that which the complainant, before suit, had asked as the price of a license authorizing an exclusive or unrestricted representation of the play by the defendants in Philadelphia. When

this price was asked by her she asserted a claim of statutory copyright. This claim is not maintainable. Had she known then that her literary proprietorship was precarious from its dependence upon effects of publication, she probably would have been willing to grant such a license for a lower price. She named the price, not as the consideration of a proposed compromise, but as her own estimate of the value of the license which a secure copyright would have enabled her to give. There is, consequently, no probability that she will eventually recover an amount which, with the addition of costs, will equal the sum in deposit. It is true that, as her offer was not accepted, she is not precluded from proving, if she can, that a license from her would have been worth more than she asked for it, or that she has in some other mode sustained loss to a greater amount. Her counsel say that the success of the play has been much greater than was expected when she named this price, and urge that the extraordinary excess of profit should neutralize the effect of her proposal. Proof of the actual profits might, for this purpose, be proper for the consideration of a jury. But such proofs might be of little avail against the effect of her own estimate of the value of a license.

The Court, in announcing the foregoing views, added that an issue to determine the amount of the complainant's damages would be ordered, if asked by either party, and that, if neither party asked it, the case would be referred to a master to report the proper amount of her compensation. The court strongly recommended a settlement of the controversy.

The cause formally stood over for the amendment in the description of the citizenship of the complainant. This amendment was not made until July, 1860. When it was made, the defendants filed an addition to their former answer, and also filed a plea. The addition to the answer was not of such a character that it could regularly have been filed in so late a stage of the cause; and it was not relevant, in anywise, to the

amendment of the complainant's bill. But, upon a special reason, suggested by the counsel of the defendants, they were allowed to make the addition as an amendment of their former answer.

The plea which they filed alleged that the complainant was, when the suit was instituted, the wife of a person of a given surname, whose Christian name was not given. He was described as now in Australia; but his calling or business was not specified, nor was his identity in any other manner determined. There was no allegation that her asserted marriage was a newly-discovered fact. On the contrary, the defendants, in the course of examination of a witness, had, more than a year previously, made strenuous efforts to prove that she was married to a person of the surname given in this plea. Their counsel, however, insisted that, as the complainant had amended her bill, they were not only entitled to answer anew, but were, under the 39th rule of equity practice, entitled also to plead, notwithstanding their former answer and present additional answer.

An amendment of a complainant's bill, except so far as it may introduce a new or different case, has not the effect of opening the pleadings in an equity suit. The Court looks back through the pleadings, to ascertain whether, and how far, the amendment may have introduced such a case. So far as it may have been introduced, the defendant may demur, plead, or answer anew. Unless a new case is presented by the amended bill, a defendant's former answer to the original bill overrules any plea which he may interpose after the amendment. The 37th and 39th rules do not apply so as to introduce a contrary practice in this respect. Their purpose cannot have been to permit a defendant, in such a case, to introduce, in a late stage of the cause, matter which might have been insisted on by way of plea when the former answer was filed. If this were, in general, otherwise, matters of abatement and objections to the character of the parties are expressly excepted from the operation of the 39th rule, which is, therefore, inapplicable to this plea. For these reasons, and because the plea

wanted the requisite specification, and omitted certain usual averments, and was not properly verified, the complainant's counsel moved that it should be taken off the file. The Court permitted the complainant, without prejudice to this motion, to set the plea down for a hearing. It was then, upon argument, overruled.

In the interval which had preceded this final adjustment of the pleadings, I had considered the question of the complainant's literary proprietorship, as it had been asserted independently of the copyright laws. The case not having been settled by agreement, and an issue appearing to be necessary, the continued forbearance to express an opinion upon this point seemed improper, as its expression might perhaps have some influence in determining the pecuniary result of the issue. In stating my views of the question, the order in which the subject has been investigated privately for purposes of self-instruction will be pursued.

*Proprietorship* is a certain or contingent exclusive right of unlimited or limited profitable use of an ascertainable subject, corporeal or incorporeal. Proprietorship, thus defined, is compounded of the proprietor's beneficial rights, and his right of excluding other persons from the use or profit. Any such use as may be of actual or possible advantage or convenience to himself, or any other person, is *profitable.* When the proprietor's right of excluding others from such use, or from the profit of it, is unlimited, as to persons *and* purpose, the proprietorship is absolute. When the right of exclusion is limited, either as to persons *or* as to purpose, the proprietorship is qualified. It is ended when the right of exclusion ceases wholly. The question is, how far the property called *literary* is within the general doctrines of the law of proprietorship. Though not an anomalous it is a peculiar subject of these doctrines.

A LITERARY COMPOSITION *is an original result of mental production, developed in a series of written or printed words,*

*arranged for an intelligible purpose in an orderly succession
of expressive combinations.* The person by whom the composition is primarily thus developed is its *author.* An author and his assigns are included in the meaning of the general phrase, literary *proprietor.*

The uses of the composition consist in, or depend upon, actual or potential communication of the knowledge of the contents.

The communication of such knowledge may be *confidential.* It is of this character whenever conventional or other personal relations of the receiver to the maker preclude any rightful ulterior communication of the knowledge acquired. The simplest example, where the relation is *conventional,* occurs in the case of a loan by a literary proprietor of a book, of which the contents are unknown to others. (See 4 H. L. Ca. 919, 920.) This is a bailment of it, to be read by the borrower, who receives it under an implied confidence, precluding his use of it for any other purpose. (2 Ld. Ray. 915.)

More extended and complicated cases of implied confidence, where the breach of it has been redressed or prevented in the course of the administration of equitable jurisprudence, have been mentioned under a former head. Other examples will hereafter be mentioned incidentally.

Lord Mansfield and Willes, J., in 1769, (4 Burr. 2398, 2399, 2395, 2396, 2312,) and Aston, J., in 1774, (17 Cobb. Parl. Hist. 980,) were of opinion that, even in the absence of confidential relations, rules of decision on questions of literary proprietorship might be deduced from principles of "private justice, moral fitness, and public convenience." But Lord Eldon discarded this doctrine. (3 L. Journ. Ch. 209.) It has been criticised and condemned by De Grey, C. J., (17 Cobb. P. H. 990;) Lord Camden, (Ib. 998;) Pollock, C. B., (4 H. L. Ca. 935, 936;) and Lord Brougham, (Ib. 968.) Some of these judges conceded that what was manifestly *against* the public interest might, for that reason, be *rejected* from the law. But they all concurred that those who administer jurisprudence cannot on this, or any other subject, create and define rights merely because, in their opinion, such rights ought, according

to justice, propriety, and convenience, to exist. Rules of decision on the subject of literary property must, therefore, be sought in doctrines of the common law, or must be traced in principles from which its rules may appear to have been derived.

The present subject of consideration is *literary proprietorship* alone, regarded as independent of any question of confidential relations.

The ordinary definition of *literary property,* as the exclusive right of the proprietor to *multiply copies* of the composition, is, for general purposes, too narrow, because, where the proprietorship exists, the circulation of copies is not the only specific method in which the subject may be profitably used. The definition is thus too narrow for the specific purposes of the present case, where the question to be decided arises from the use of a literary composition in another mode—that of theatrical representation. Literary property may be described as the right which entitles an author and his assigns to all the use and profit of his composition to which no independent right is, through any act or omission on his or their part, vested in another person.

This definition, or description, cannot be applied without a specification of the profitable uses of a literary composition. Their specification includes all such methods of communicating a knowledge of the contents as are not exclusively confidential.

Such communications are effected by reciting or audibly reading the composition, or by circulating it. The recitation, or lecture, or circulation, may be *private* or *public.*

A recitation or lecture before a *select* audience is *private,* and before an *indiscriminate* audience, *public.* This distinction determines the difference between private and public *theatrical representation.* Such a representation of a dramatic literary composition includes its recital.

A *circulation* is an act by which a literary proprietor parts with possession of the original manuscript, or a written or printed copy, for any purpose not exclusively confidential. The original manuscript, however, is very seldom circulated.

The distinction between the *private* and *public* circulation of *copies* is differently determined, as they are *manuscript* or *printed*.

*Writing* is a method of originally developing the composition, and of *adding* copies made *singly,* letter by letter. *Printing* is a process of *multiplying* the copies, *by sheets.*

Thus the difference is that between *multiplication* and *addition.*

Human means of increasing the number of copies by writing are extremely limited. By printing, they may, on the contrary, in the words of Lord Cranworth, be multiplied *indefinitely.* (4 H. L. 833.) The books printed by those who first publicly practiced the typographic art in Europe usually contained an advertisement that they were not written, as all books had previously been, but were made by a new invention, whereby the several sheets were stamped at once, and not made line by line as formerly. (See Dibd. Typ. Antiq. I. 20.) Judge McLean has truly said, that manuscripts, in modern times, cannot. be of *general* use. (4 McL. 304.) In 1519, as we learn from a book published in that year in England, printing had already almost ruined the business of the scribes. (Dibd. II, 480.) In 1693, it was judicially said, that "in primitive times, before printing was invented, writing was found to be an overt act, and made high treason; therefore, printing was, more manifestly, an overt act." (12 How. St. Tr. 1248.) In literature, and in law, every manuscript copy requires a separate authentication; and no such copy can be so authenticated as to become the substitute for an accessible original. But, for *purposes of circulation,* the manuscript from which an authorized edition is *printed* has discharged its office when the copies are struck off; and every copy of the impression is, for such purposes, an authentic counterpart of the others. The printed copies have been judicially designated as *all originals.* (32 How. St. Tr. 82 to 86, 2 Stark. Rep. 130, 114.) Legal as well as practical differences have thus resulted from the disuse of writing and substitution of printing, as the ordinary method of making copies for general circulation. The judicial

recognition of these modern differences has not been attended with any disregard of the rules of ancient jurisprudence. But the practical application of these rules has been modified in adapting them to the change of usage.

The circulation of *written* will be considered before that of *printed* copies.

The distinction between a public circulation of written copies, and a restricted or private communication of their contents, was, for some purposes, recognized before the use of printing. (Wilkins Conc. iii, 317, A. D. 1408-9; Middleton's Dissert, note (u,) A. D. 1410; also in Ames' Typ. Ant. 64; Herbert, 86, and Dibd. I. 321.*) But, except under special and unusual circumstances, an author who then parted with a manuscript copy gave to it the most public circulation of which it was capable. *Now,* the parting by an author with manuscript copies of his unprinted composition is ordinarily regarded as an act of mere private circulation. (2 Atk. 342, 343; Ambl. 737; 2 Swanst. 414; 2 Story, 109 to 112; 4 Duer, 379; 2 Eden, 329; 8 Pet. 657. 661; 14 How. 530, 531; 17 How. 451, 453; 4 McL. 300; 2 Barn. & Ald. 298; 2 De G. & Sm. 652, 691; I Hall & T. 21; 1 Macn. & G. 42.) Under the laws concerning patents for inventions, a previous description of the alleged invention in a "public work," which means a printed book, defeats a patent. But, such a description in an *unprinted* book has, in itself, no such effect. This distinction would, in like manner, determine the novelty of an invention, if those laws had contained no express enactment on the subject. (See the note to Webster Pat., C. 718, 719; 9 M. & W. 302; 15 How. 110.) We have seen that in the copyright laws, likewise, the word *publish* means publish in *print*.

*Printed* copies also may be circulated *privately*. Their circulation is thus private when they are delivered to a few ascertained persons only, who receive them under conditions expressly or impliedly precluding any ulterior diffusion of the

---

* Dibdin's translation, in substituting a plural for a singular goes beyond the warrant of the Latin text.

knowledge of their contents. Such a case occurs when a small first edition of a book, printed with a notice on the title page that it is for *private circulation,* is gratuitously distributed by the author among particular persons. Mr. Justice Talfourd, when at the bar, issued, in this manner, the first impressions of his tragedy of Ion. Here the restriction was expressly defined. It may, in other cases, be implied from the selection of the persons, and from the method or attendant circumstances of the delivery. (2 De G. & Sm. 652; 1 Hall. & T. 1; 1 Macn. & G. 25; 4 H. L. Ca. 833, 919, 920.) The circulation must be restricted both as to persons and purpose, or it cannot be called private. The reasons that require this twofold restriction will be stated hereafter, under another head. In the meantime, we may observe that the case of a small first edition of a book, printed by subscription, where the subscribers take all the copies, is not a case of private circulation. Here the persons are, it is true, ascertained. But, the use to be made by them of the copies is not expressly or impliedly restricted.

Any authorized act, such, for example, as a sale, which unrestrictedly sends forth a printed copy—in short, any act of circulation which is not within the above definition of a private one—is a *public* circulation. Thus, in the case of a book printed by subscription, the delivery of a single copy to a subscriber is a public circulation.

Cases for the application of the distinction between the private and public circulation of *printed* books rarely occur. The distinction might, however, under the above-mentioned provision of the patent law, be attended with an important difference.

The *uses* of a literary composition have thus been described, not according to their effects, but with reference to their specific *methods.* The consideration of their effects and consequences will be postponed, in order that the legal *nature* of the composition, the legal *source* of literary proprietorship, and the *objections* to its existence and continuance may be previously considered.

A literary composition is of an abstractly incorporeal nature. Its existence is independent of that of any material on which it may have been produced, or copies of it may have been inscribed or imprinted.   (14 How. 451 to 453; 2 De G. & Sm. 716; 4 H. L. Ca. 833.)   The incorporeal contents of the original sheets, and of all written or printed copies, are thus one and the same composition.   An invention or discovery in art or science may also have an incorporeal existence independent of that of its embodiments.   For this reason, and others not here pertinent, exclusive rights of literary proprietors and inventors, even when secured by legislation, depend for their existence, continuance, and enforcement upon reasons peculiarly metaphysical.   (2 Sto. Rep. 291; 1 Mason, 472; 2 Blatchf. 246.)   The most cautious language of judges concerning such rights is liable, sometimes, to the danger of being found susceptible of a less unqualified application than was intended.   (1 Sto. Rep. 288, 291; see 11 How. 606.)   In cases not legislatively provided for, this danger cannot be less great.

Inventions, literary compositions, and other primary results of mental development are incapable of any profitable use, independent of actual or potential communication of the knowledge of the results.   Actual communications of the knowledge are irrevocable.   The original possessor of the knowledge cannot afterwards, by any physical or other process of resumption, deprive others of it, or by any physical means prevent its ulterior communication, or suppress any such diffusion of its fruits as can be directly or secondarily effected through any means which he has once placed at the command of another person.

This physical irresumableness of the knowledge of a primary result of mental development, and the shifting possession, and indefinite number of the embodiments of the results, are incidents distinguishing it, as a subject of asserted proprietorship, from such an easement, or other privilege, as though incorporeal, is exercisable in a fixed corporeal subject.   Over such a subject, the proprietor who, in granting the privilege, imposes

conditions on its exercise, may have a physical control. (4 H. L. Ca. 964.)

The embodiments of literary compositions and inventions, though of indefinite number, and uncertain possession, are, nevertheless, *lasting* memorials of the results of the mental processes by which they have been developed. In this respect, they differ from primary results of mental processes whose development is purely intellectual, such as oral discourses. An oral discourse, though studiously prepared and committed to memory, depends for its retention or communication upon a fugitive or evanescent mental impression. Such a result of mental development may be the subject of conventional engagements, express or implied, or of confidential relations, imposing duties cognizable in a court of equity. But it cannot be the subject of proprietary right. (3 L. Journ. Ch. 209, imperfectly reported on this point, in 1 Hall & T. 28, 33, 35, 38, 39.) The case of a literary composition is different. The existence of the author's manuscript, or of a single true copy, suffices to give a durable existence to the literary composition inscribed upon it. (3 L. Journ. Ch. 209; 2 Atk. 342; Ambl. 737; 2 Eden, 329; 2 Swanst. 402; 4 Duer, 379, 382, 385; 1 Sto. Rep. 100; 14 How. 530, 531; 2 De G. & Sm. 691, 692, 673; 1 Hall & T. 21 to 23.) Before the art of printing was known, manuscript memorials of results of intellectual development of unquestioned authorship had been preserved for thousands of years. The typographic art now secures them against even a liability to oblivion until the desire for their perusal ceases. This exemption of printed books from liability to be forgotten through the mere want of copies was one of the consequential advantages of printing proclaimed by those who first practiced the art. The verse of Milton and the prose of Newton have been since judicially designated as *immortal*. (17 Cobb. Parl. Hist. 1000; 4 H. L. Ca. 964.)

The memorials of results of invention may be not less enduring, either through their actual embodiment, or their literary description. But a difference of practical importance distinguishes a literary composition from an invention.

The memorials, however lasting, of an invention or discovery, do not contain any such intrinsic tests of novelty and authorship as are peculiar and inherent in every literary composition.    The novelty and authorship of an invention require extrinsic verification.    Unless they are attested by an act of State, the invention is not a subject of proprietary right, though, like an oral discourse, it may be the subject of an equitable binding confidence, or of conventional obligation, express or implied.    A literary composition is, on the contrary, always the distinguishable result of its author's own mental development.

On this point of *distinguishableness,* the last observation might have been prefaced by the remark that such a composition, as a more or less complex result of successive mental processes, differs from a mere simple result of a mental process or mental processes.    Any composition, large or small, which includes results of successive mental processes, *rationally combined,* whether it fill a great volume, or be contained in a single small sheet, is within the legal denomination of a *book.*    ( 2 Barn. & Ald. 300; Cowp. 623; 11 East, 244; 2 Campb. 25, 27; 2 Paine, 382.)    But statements, propositions, or sentences, having no connection, or mutual dependence, would not, by being written or printed in motiveless juxtaposition, be brought within the definition of a book or literary composition.    Much less would an isolated statement, proposition, or sentence, though written, be within the definition, as it has been understood for thousands of years.    (See 2 Wall. Jr. 565; 2 Campb. 26, 27, 28, 30, 32.)    Upon this difference, which has, more than the others, been overlooked, the *distinguishableness* of the composition, as the result of its author's mental creative labor, depends.    Results of such productive labor, when developed beyond their simplest elements, cannot be *new* without being *original.*    A simple thought or statement may, perhaps, through an accidental coincidence, be expressed originally by each of two persons, in a single brief sentence composed of the same words arranged in the same precise order.    Such a coincidence, however improbable, cannot be regarded as quite im

possible.  The possibility of its occurrence in a translation, or in a scientific literary production, is undeniable.  But, a prolonged series of thoughts or statements, each one in itself simple, cannot have been expressed *originally* by two persons in the same words arranged in the same succession.  In language of the mathematician, such a coincidence is infinitely improbable.  It has, from experience, been long recognized as absolutely impossible.  Practically, this impossibility has been tested and ascertained in the case of even such a book as a directory.  (12 Ves. 270; 16 Ves. 269; see 2 Sto. Rep. 793; 2 Russ. 385.)  Its authorship is traced through its distinctive peculiarities or occasional mistakes.  If it is not capable, in any mode, of identification as the production of an author who is, or may be, known, it is not a literary composition.

Such a composition is, therefore, always an *ascertainable* subject of any legal proprietorship of which it may be capable.

The legal *source* of the proprietary right of authorship, of which the subject has thus been described, is that species of occupancy called *production* as distinguished from invention. To the products of our mental creative labor, we have, as it were, given their existence, *ut in rerum natura essent fecimus.* (ff 41. 2. 3. § 21; Grotius, de Jur. Bel. et P. 2. 3. 3, 2 Bl. Com. 405; 2 Wall. Jr., 564; 2 De G. & Sm. 695; 4 H. L. Ca. 867; Merlin Repert.  Tit. Contrefaçon.)

Blackstone refers to classical authorities which show that, in some cases, the dramatic authors of ancient Rome sold their original manuscripts, or first copies of them, to persons desirous of performing them at the theatre.   (Com. ii. 407.)   The passages which he cites prove that the prices received exceeded greatly those paid for subsequent copies.   A theatrical audience at Rome, accusing a dramatic author of what we now designate as a a literary piracy, called him a thief.   The subject of the charge was a translation from the Greek of a play, of which a previous translation had, without his knowledge, been already represented at Rome.   In justifying himself he drew the line of distinction between translation and plagiarism; and showed

that where two successive translations were independently made, the second was not a piracy. But, except in cases of compositions written for public recitation, ancient authors cannot have had any reason for desiring to monopolize or control the circulation of their literary productions. The danger already mentioned of their being lost in oblivion might not be averted by the circulation of the greatest number of copies that other persons might be willing to make. From the difficulty and the delay in making them, and their great cost, this danger was always impending until the introduction of typography. Until after this period, the doctrine of literary proprietorship cannot have been developed. Its germ is, however, discoverable, perhaps, in the jurisprudence of ancient Rome. In the case of an artist who painted a picture by mistake upon a tablet not his own, supposing it his own, the question whether the picture belonged to him or to the owner of the tablet was discussed by lawyers in Rome. The prevalent opinion was that the artist should have his picture on paying the tablet's value to its former owner. It was thought absurd that the proprietorship of a work of art should be dependent upon that of a thing of so little account as the tablet. (Inst. 2, 1, de rer. div. § 34, ff 6, 1; de rei vind. 23, § 3; 41. 1 de adq. rer. dom. 9, § 2; Caii Inst. 2, 1, de rebus, § 6.) Sir. J. L. Knight Bruce reasoned similarly, in a late case, where unauthorized impressions had been made from copperplates, remarking upon the substantial worthlessness of the material except for that in which its former owner had no property, and comparing the case with an unauthorized circulation of a literary composition. (2 De G. & Sm. 716, 691 to 696.) We read, however, in several passages of the Roman law, that the rule applied, as above, in the case of a picture, was not applicable in the case of a writing. According to these texts, though the writing were in letters of silver or gold, its ownership followed that of the substance on which it was contained, so that if a person inscribed a poem, history, or oration upon the material of another man, it became the latter's property. He could reclaim it, but was obliged to pay to the scribe, who had used it inno-

cently, a compensation for the writing. (ff 6, 1, de rei vind, ubi supra, 41, 1 de adq. rer. dom. 9, § 1; Inst. 2, 1, de rer. div. § 33; Caii Inst. ub. sup.) Thus, in the language of a commentator, an original painting was regarded as of greater account than a mere copy of a literary composition (pictura literarum.) But, as the law of accession was understood in the modern jurisprudence of continental Europe, the rule was different; and the writing belonged, in such a case, to the scribe, who, on paying the value of the paper to its owner, was entitled to keep the copy. (Cujas on Inst. 2, 1, 33, 34; Pothier Propriété, § 173; Code Nap. Art. 568.) Some of the texts of the old Roman law which have been cited may be read as applicable not only to the writing of a copyist, but also to an original composition written, through mistake, by its author, upon the material of another person. But others of the texts do not admit of this interpretation; and perhaps none of them absolutely require it. If the meaning of any of them was that the decision as to a painter's original picture and an author's original manuscript should not be the same, the reason for the rejection of their authority by modern civilians was the stronger. Pothier designates the opinion that the ownership of the paper should carry with it that of the composition as ridiculous. Lord Cranworth, in remarking upon a picture and an engraving as the subjects of a claim of proprietary right, recently said that the difference between them was in the method in which copies of an engraving could be multiplied. He said that a picture was analogous to a manuscript, and that an engraving was the same as a book. (4 H. L. Ca. 833.)

If the measure of proprietary dominion were dependent upon the *source* alone of proprietorship, that of an author and his assigns, thus deduced from his creative labor, would be capable of existing to an unlimited extent. The enjoyment of subjects of *original* proprietary right is less dependent than that of derivative acquisitions upon conditional regulations, imposed from reasons of policy. Under the head of occupancy, the specific proprietary right of *invention* may, indeed, as in the case of treasure found in the earth, or things found

afloat on the sea, depend upon, or be modified by, considerations founded on such reasons. (Bracton, 120.) But no such considerations restrict a *producer's* right of dominion over the fruits of his own labor. Willes, J., nevertheless, was of opinion, that if a literary proprietor had, independently of legislation, a perpetual exclusive right of printing his composition and circulating printed copies, his exercise of the exclusive right might be regulated by implied conditions, requiring him to supply the fair demand for his book by keeping always in the market a sufficient number of copies for sale, at reasonable prices; that his failure thus to supply the demand might be interpreted as a relinquishment of his exclusive right; and that his unfair enhancement of the price might result in a forfeiture of the right of exclusion. (4 Burr. 2310, 2335.) In these views, Gould, J., on grounds of "public convenience," (17 Cobbett Parl. H. 983, 984,) and perhaps also Lord Mansfield, (4 Burr. 2407,) concurred. But Lord Northington had previously expressed a different opinion, (2 Eden, 328,) which Yates, J., quoted with approbation; saying that, if the property existed, "the public would have no tie upon authors or booksellers to oblige them to keep a sufficient number of copies printed," and that the inference of an abandonment from their omission to do so would be impossible. (4 Burr. 2392.) The opinion of Yates, J., in the course of which these remarks were made, has been respectfully mentioned by the Supreme Court of the United States, (8 Pet. 655) ; and Lord Camden, De Grey, C. J., Pollock, C. B., and the Lord President of the Court of Session in Scotland, were of opinion, that if the perpetual exclusive right existed, it included the right of suppressing the supply. (17 Cobbett Parl. Hist. 1000, 991; 4 H. L. Ca. 936; Boswell's Report of Hinton *v.* Donaldson, pp. 34, 35.)

The contrary notion of Willes, J., and Gould, J., was founded upon assumed analogies in the law of monopolies, and the law as to forestalling, regrating, and engrossing. The analogy to monopolies was mistaken. Exclusive rights within the definition of a monopoly cannot exist anywhere without

the support of an act of state, (3 Inst. 181 ; 2 Atk. 485 ; Hawk.
P. C. Bk. 1. c. 79; Skin. 169; 10 How. St. Tr. 380, 386, 424,
542) ; and, in the United States, cannot be created otherwise
than by an act of legislation, or under the authority of such
an act. (7 Pet. 319; 10 How. 493; 6 Wharton, 46; 11 Pet.
540 to 546; 10 How. 417.) The other supposed analogy was
not less mistaken. Forestalling, regrating, or engrossing con-
sisted in the fraudulent enhancement of the market price of
necessaries of life, by accumulating stores of them through un-
fair purchases. But there never was anything illegal in a re-
fusal or omission to sell one's own stores, or in accumulating
them otherwise than by unfair purchases. In a time of
dearth, or even famine, the product of a man's own land,
though a necessary of life, (such as a store of grain,) may be
lawfully kept by him on hand. He may illiberally refuse to
sell it, or unwisely let it rot in his granary. Even in the case
of purchasers which affected injuriously the market, if the
article was bought in order that it might become the subject of
any industrial process—as where barley was to be malted, or
grain worked into starch—its accumulation, though excessive,
was never unlawful. (Cro. J. 214; 3 Inst. 195; 13 Co. 18; 2
Brownl. 108; Cro. Car. 231; J. Bridgm. 5, 6; Mo. 595, pl.
810; 2 Keb. 470; 1 East. 155 to 158.) The opinion of Willes,
J., therefore, seems to have had no sufficient legal foundation.

Literary proprietorship, having thus a legitimate original
source in mental production, the question of its legal *existence*,
absolute or qualified, has been resolved into that of its capacity
for *continuance* after any profitable use of the composition. That
this capacity exists independently of legislation has been denied
on three grounds, all of which have been already partially men-
tioned : the first, that of the impossibility of a proprietary
physical control of the embodiments; the second, that of the
abstractly incorporeal nature of the composition ; and the third,
that of the right of public use, which may result from com-
munications of the contents. Sometimes, the first two ob-
jections have been considered as one; at other times, the third
has been discussed alone, as if it included the others, or super-

seded their consideration.    But the three should be considered separately, in the order in which they have been stated.

To the first objection, the answer has been that, according to the general law of property, the criterion of its capacity for continuance is not the retention, by the original proprietor and his assigns, of the possession or immediate control of the subject.   The present or eventual *distinguishableness* of the subject, enabling him to trace back its identity with what was, in an absolute or qualified sense, his own, suffices for the continuance of his absolute or qualified proprietorship.   The proprietorship, thus traced, may have a present or eventual existence, not in the original subject of it, but in a representative product or substitute, which may be specifically similar or different.   The distinguishableness may suffice, though embodiments of the subject, or of its products or substitutes, may be multiplied, however changeable may be their positions, and however they may be beyond his control.   The unauthorized use of the known trade-mark of a manufacturer, or other dealer, is thus actionable.   This having been decided in England, *at law,* in 1824, conformably to more ancient doctrine, (3 Barnw. & Cress. 541; 33 Eliz. cited Cro. J., 471; Poph. 144;), Lord Cottenham in 1838, in a case *in equity,* where no fraud could be imputed, prevented, by injunction, such a use of trade-marks, and said that the plaintiff had *a title* to the marks.    (3 Mylne & Cr. 352.)    Though Lord Langdale afterwards, in 1842, thought that the right in a mere mark, or name in trade, was not proprietary, but that the remedy was, in such cases, founded alone upon the equitable jurisdiction to redress or prevent fraud, (6 Beav. 73,) his opinion has not been followed.   In 1853, Vice-Chancellor Wood called a pin-maker's right of exclusive use of his labels a *right of property* acquired by user.   (11 Hare, 78; 23 Eng. L. & Eq. 55.)   In 1856, in the Chancery Court of Appeal, the right in a particular *trade-mark* was called by Lord Cranworth a *legal* right, in support of which the jurisdiction of equity was exercised, in order to make it more effectual.   (6 De G., Macn. & G. 217.)

This he would scarcely have said, if he had not agreed with Lord Cottenham in thinking the right proprietary. Specific changes of embodiment are exemplified in cases in which the foreign investments, re-investments, and ultimate returns of commercial adventures are pledged, or otherwise appropriated, to secure pecuniary advances on the outward consignments. For such cases, the rules of the present law of the United States and England resemble those which were applied in the ancient jurisprudence of both Greece * and Rome.† The returns from remote regions, in varied specific forms, become the substituted security for the outward adventures. The special property which the lender had in them, for purposes of self-security, is transferred to, and continues in, their product or substitute, in whatever ultimate form of investment, or of re-investment it may exist. (1 Peters, 444 to 448; 4 Wash. C. C. 418, 662; 4 Peters, 291; 1 Bos. & Pul. 563; 1 Curtis, 130; 8 How. 438, 439, 399, 400.) This qualified proprietor may not have any control of the particular destinations abroad, or any right of custody of the subject of his security until the termination of the adventure. The returns, before they reach their ultimate destination may be fraudulently sold, and their proceeds invested wrongfully. The unauthorized investments may then, at the lender's option, be followed; and, so long as they can be distinguished as the product of, or substitute for, the former security, may be reclaimed by him. His proprietary right ceases only when the subject ceases to be thus *distinguishable,* and then ceases only because the means of ascertainment fail. (3 M. & S. 578, as applied in 1 Pet. 448.)

Consequently, as a literary composition and its authorship are *distinguishable,* wherever it may exist, the first objection fails.

The second objection, of its abstractly incorporeal nature, would not, independently of the first objection, render the

---

* Demosth. in Lacrit. and in Dionysiod.

† Dig. 22, 2. de naut. fœn.; also, 44, 7 de obl. et act. 23; and 45.   1 de verb. obl. 122, § 1; Cod. 4, 32 de usur. 19, 26, § 1; and 4.   33 de naut. fœn.; Paul. Recept. Sent. 2.   14 de usur., § 3.

composition incapable of being the subject of proprietor-
ship. In proof that rights not less abstractly incorporeal
may be proprietary, the case of an option, or a turn of an
advowson, has been instanced, (1 W. Bl. 338.) The doctrine
of the Roman jurists and modern civilians, that a sale and
purchase may be valid, though the subject of it has no phy-
sical existence, has been followed in English equitable juris-
prudence. (ff 18, 1, 8, § 1; Poth. Vente 6; Merl. Repert.
Vente § i, Art. i, ii; 8 Price 269, (n.) 1 Jac. & W. 262; 1 Hare
556, 557\*; 1 Mylne & K., 488; affirming 4 Sim. 524.) The
subject, according to the civilians, may be a simple expecta-
tion, or a chance. Examples of the sale of the draught of a
net, or of a shot at game, are followed by the remark, that
when the seine is drawn or the arrow sent, the price becomes
due, though no fish be hauled in, or game brought down.
The sale of next year's vintage, or peach crop, or ice cutting,
is a disposal not of the grapes, or peaches, or ice, of which
there may be none, but of the incorporeal right of taking
such grapes, or peaches, or ice, if any, as the seller's vine-
yard, or orchard, or pond may, during the season yield. The
good-will of a trade or business, consisting in the mere prob-
ability that old customers will desire to continue their former
course of dealing and commercial association, "is a subject of
value and price," which "may be sold, bequeathed, or be-
come assets." (6 Ad. & El. 438.) "The advantage of a
newswalk" has, accordingly, been "held to be assets" of a
deceased person's estate. (5 Bos. & Pul. 70.) An estab-
lished business may have a value independent of its continu-
ance at the place where it has hitherto been transacted. (6
Beavan 276, 277.) In the case of a newspaper or other peri-
odical journal owned in partnership, the value of the sub-
scription list, upon the death of a partner, does not survive,
but must be accounted for by surviving partners in their
settlement with his personal representative. (1 Parsons, 298,
280, 297, 303; 7 Simons, 421.) Among living persons, trans-

---

\* Cited 23 How. 129.

fers of such subscription lists have been sustained, and effect has been judicially attributed to the continuance of the former name under which a journal has been conducted or other business carried on. (8 Ves. 215; 17 Ves. 342; 1 Sim. & S. 124; 1 W. Bl. 335; 1 Harris, 242.) The name, in such cases, resembles a manufacturer's distinctive trademark, as to which the law has already been stated. Such a mark, when used in an established business, appears to be regarded in France as an accessory of the good will. (See Compere *v.* Bajou, in Upton on Trade-marks, 75, 78, from an authentic report in the New York *Times* of 1 Feb. 1855.) Where products of artistic skill, resembling one another specifically, are made for a particular market by many producers, none of whom can monopolize the market, an exclusive right of one of them to annex a particular mark to products of the specific resemblance offered for sale in the market, is, perhaps, more abstractly incorporeal than the right of literary proprietorship.

The second objection also, therefore, fails.

The third is founded on the *rights of the public*. This objection and the answers to it involve a consideration of the *effects and consequences* of those profitable uses of a literary composition, of which the *methods* have already been described.

A *publication* of such a composition is an act which renders its contents, in any mode or degree, an addition to the store of human knowledge.

Every communication of a knowledge of such contents, or of any other primary result of mental development, unless confidential, is, more or less, a publication.

The peculiarities of the law of literary proprietorship, distinguishing the subject of such proprietorship from other incorporeal property, such, for example, as an easement, are chiefly dependent upon effects or tendencies of publication. That the sole proprietorship of an author's manuscript, and

of its incorporeal contents wherever copies exist, is, independently of legislation, in himself and his assigns *until he publishes it*, is a proposition which has been twice recognized by the Supreme Court.   (8 Pet. 657, 661; 14 How. 530, 531; and see 4 McL. 300.)   In England, the authorities on the subject have been reviewed in a recent case, in which this doctrine was regarded as established.   (2 De G. & Sm. 691; and see 1 Hall & T. 21; 1 Macn. & G. 42.)   In a subsequent case, the opinion of this Court appears to have been that literary proprietorship exists when, and continues as long as, an exclusion of others from the use and profit of the composition may consist with legitimate effects of publication.   (2 Wall, Jr., 564.)

An *unqualified* publication *dedicates* the contents to the *public*.   (See 2 Sto. Rep. 109; 1 Hall & T. 18; 4 Burr. 2335, 2363, 2364, 2365; 8 Pet. 655.)   A landowner's express or implied concessions, through which an easement is acquired by the public, are, also, a dedication to the public.   But, from the differences in the natures of the respective subjects, the two dedications differ in such of their legal effects as depend upon the dedicating proprietor's own definition of his intended purpose.   In the case of an easement, his intention, so far as definable from his acts and omissions, always determines the existence of the rights of the public, and ascertains their extent.   (17 How. 426; 5 Watts & S. 141, 143; 8 Ad. & El. 99; 5 Taunt, 127.)   Wherever this intention is incapable of taking effect, his dedication is ineffectual except as a mere license revocable at his pleasure.   (11 M. & W. 830; 13 M. & W. 838.)   The existence of the public easement, in such a case, is thus not less dependent than that of a private easement is in all cases, upon the intention of the proprietor of the land in which it is exercisable.   But, when a literary proprietor does an act which has the effect of such a dedication, the public may acquire from it rights independent of any optional definition by himself of his intention. The cases in which this may occur are of two classes.

Cases of one class are those of "dedication to a *limited*

*part of the public."* Except in the single case of a charitable
disposition, unincorporated persons not individually ascer-
tained are legally incapable of acquiring property. That
which would otherwise be a dedication to the use of a *limited
number* of *unascertained persons* must, therefore, either enure
to the benefit of the *whole* public, or take effect as a mere
license. The latter is the effect when the existence of an
easement is in question. (11 M. & W. 830.) So, in the case
of a charitable disposition incapable of taking effect, the
former proprietorship continues. But, in the case of a liter-
ary composition, the rule is the reverse. Thus, although the
number of a theatrical audience was strictly limited, how-
ever small it might be, and however high the price of admis-
sion, yet, if no discrimination were exercised as to the per-
sons admitted, the representation before such an audience
would enure to the benefit of the whole public. (See 12 Ad.
& El. N. S. 237.)

Cases of the other class are those of dedication to the
whole public for a *limited purpose*. The *purpose* of the dedica-
tion of an easement for public use may be limited. (2 Campb.
262 (n); 11 M. & W. 830. See 5 Taunt. 127.) But, here
again, the rule as to a literary composition is different. When
the composition is published without any discrimination as
to persons, a restriction of the purpose, or of the extent, of
the publication would be futile. Such a restriction cannot
prevent ulterior diffusion of the knowledge of the contents
by unknown persons. After such diffusion, the publication
could not be suppressed without injustice to other persons
to whom the knowledge might have been communicated.
The restriction being thus, as to the public, a nullity, the
effect of the publication is irrevocable and unlimited.

In the case already mentioned of a book published by sub-
scription, although the subscribers receive all the copies,
the effect of the publication is unqualified, because their de-
livery is unconditional.

In cases under all these heads, though a literary proprie-
tor's publication may thus have effects beyond his control,

he may, nevertheless, consistently with all that has hitherto been said, retain his former proprietary rights, except so far as his acts of publication effectively enable others, either directly or secondarily, to make ulterior publication.  In cases of the dedication or easements, the former proprietorship is always retained so far as its rights may consist with rights of the public.  How far such doctrine is applicable to literary proprietorship is an inquiry which will not be reached until after some other subjects have been considered.

The foregoing remarks are a sufficient preface to the distinctive definitions of a *limited* and a *general* publication of a literary composition.

*A limited publication* of it is an act whch communicates a knowledge of the contents to a *select few,* upon conditions expressly or impliedly precluding its rightful ulterior communication, except in restricted private intercourse.   2 De G. & Sm. 692; 1 Hall & T. 18; 4 McL. 300; 2 Sto. Rep. 109; 4 H. L. Ca. 965, 833, 919, 920; 2 Barnw. & Ald. 299, 301; 2 Eden, 329; 2 Meriv. 438; Ambl. 694.)

Any publication which is not thus restricted, both as to persons and purpose, is *general.*  When the word *publication* is used without an express qualification, a *general publication* is usually meant.  Thus the public circulation of a printed copy or copies is called *publication in print.*

*Private* and *public* are adjectives which, of course, cannot qualify the word *publication.*  But recitations, lectures, and circulations, which are specific *methods of effecting* publication, are, as we have seen, called *public* or *private.*  When they are called *private,* the *publication* which they effect is *limited.*  When they are called *public,* it is designated as *general.*  Recitations, lectures, and circulations, as methods of communicating a knowledge of the contents, are, as we have seen, called private or public, according to their intended specific *purposes,* rather than their tendency to cause a diffusion of the communicated knowledge beyond such purposes.

The idea of this tendency always enters into the definition of a *publication* though it be a limited one. Every transgression of the condition, express or implied, which, in the case of a limited publication, restricts the improper diffusion of the knowledge is, therefore, in a court of equity, redressed as a breach of confidence, not less than as an infraction of proprietary right.

When thus explained, the phraseology which designates a private recitation, lecture, or circulation, as a *limited publication,* and a public recitation, lecture, or circulation as a *general publication,* is, perhaps, not liable to just criticism. But, if the phraseology were liable to any critical objection, convenience, if not necessity, would have suggested its legal adoption, or that of some equivalent expressions. Otherwise, a theatrical representation before a select audience, the circulation of a manuscript, and the restricted circulation of a printed book, which are, in common parlance, called *private,* could not have been designated, as, in any sense or degree, *publications.* The phraseology, whether otherwise liable to criticism or not, has, at all events, been judicially sanctioned. (2 De G. & Sm. 692; 1 Hall & T. 18; and see the other cases last cited.)

In the case of a private theatrical representation of a play of which no printed copy has been circulated, the exclusion of all except the few selected for admission, so defines the condition on which they attend as to preclude ulterior publication. Such publication, by any of the audience, would be redressed or prevented by a court of equity both as a breach of implied confidence and as an infraction of proprietary right.

Lord Brougham compared a case of *private circulation,* described by him as a communication of the contents "to a select few placed under conditions," with a case of a restricted private easement. (4 H. L. Ca. 965.) The context of his opinion shows that he perhaps did not mean to state this as a perfect analogy; but the comparison is, for some purposes, useful. If a man, having a private right of using

a passage by land or water, between two places of his own, uses it as a passage to and from another place of his own, he cannot, because, in doing so, he passed from one to the other of the two first-mentioned places, justify the excessive use of the privilege. In such a case, the argument that, when he had used the passage between the limits designated, he might afterwards pass "whither he would," has not availed as an excuse. (1 Mod. 190, 191; 1 Ro. Abr. 391; 4 M. & W. 773, 774; 11 Ad. & El. 759; 1 Whart. 333; 5 Watts & S. 140, 143; 11 Harris, 348.) So, where an engraver who takes impressions from a plate, or a printer who prints from a manuscript, strikes off more than the stipulated number of impressions, an action at common law lies against him, (1 Barnw. & Adolph, 711;) and a court of equity, on the ground of proprietary right in the owner of the plate or manscript, will not only prevent, by injunction, any use of the copies unauthorizedly made, but will order them to be destroyed. (2 De G. & Sm. 716 to 718; 4 H. L. Ca. 833.)

As publication is not directly effected by printing, but follows it, the rule of decision, in this case of an excess in the number of impressions, would be the same, whether the purpose of the literary proprietor was a general or a limited publication. But, after a publication, the difference in its character, or defined purposes, causes a difference in the judicial purpose of the redress afforded.

In the case of a limited publication, the purpose of the redress is to maintain the privacy which the restrictive condition was intended to secure. When an exclusive privilege has been secured by statute in a book which is publicly circulated, a stranger who, in whole or in part, reproduces it in the new form of a translation, or abridgement, or index, or table of contents, or analytical review, does not infringe the statutory privilege. But either of these acts would violate the rights of the literary proprietor of a book of which the circulation had been private only. (2 De G. & Sm. 692 to 697; 4 H. L. Ca. 833.) The doctrine may be exemplified conversely. Unauthorized impressions of a lawfully pos-

sessed copy of a musical composition, equalling in their number, but not exceeding, that of such members of a musical society as were to take part in a concert at which it was to be performed, were lithographically made, and gratuitously distributed for the purposes of the concert, among these members only. The tracings on the stones were then effaced. In this case, the rights of the proprietor of the musical composition were violated. (12 C. B. 177.) As others than members of the society were admitted to the concert on the payment of entrance money, the case was not that of a private performance or limited publication. If, however, none others had been admitted, so that the performance would have been of this character, the rights of this proprietor would still, according to the reasoning of the decision, have been violated. But, if, before any other publication on his own part, he had himself authorized such an impression of copies as was made, and their distribution for such a private concert, the same reasoning indicates that this would not have had the effect of a dedication of the composition by him to the public.

The legal analogy to the case of a private easement is maintainable so long as the literary proprietor may be able to enforce the restrictive condition, express or implied, on which he may have privately circulated a copy. His difficulty is, not in enforcing the condition against the party receiving the copy, but in enforcing it against other persons not privy to the restriction. In respect of independent rights which such other persons may acquire, the analogy to an easement fails. This leads to the remark that a limited publication through which, contrary to its intended purpose, a knowledge of the contents is diffused indiscriminately, becomes, in effect, as to the world at large, a general publication. The enforcement of the restrictive condition may become impossible whenever the effect of the publication is more extended than its purpose. A book privately circulated may have been read, quoted, reviewed, and remembered, so extensively as to have become a part of the general

stock of literature. This alone, when the restrictive purpose has been imperfectly made known, must suffice to annul the restriction. The case is different where, as in that of Ion, the announcement of the restriction appears upon every copy. But, even in such a case, the limits of any restriction which can be fairly and reasonably imposed, may be exceeded. When it is exceeded, the rights of the public must be regarded. Thus, if the first edition of Ion had been a *full* one, the notice of the author's intended restriction would probably not have effectually limited the character of his publication. He published a *second* edition with a reprint of the notice on the title page. But he prefaced this edition with a concession that the composition could no longer be regarded as his own. Even where the limited publication retains its restrictive character, a greater or less tendency to a diffusion of the knowledge beyond the border of its intended restraint may always exist in modes altogether foreign to the law of easements.

Thus, even in the case of a *limited* publication, irrevocable rights may, through its effects, become vested in the public. The liability or tendency to such effects is a reason for the vigilant exercise of equitable powers to prevent parties and privies to the restrictive condition from performing acts through which the public may thus acquire such irrevocable rights. In discussing the doctrine of literary proprietorship under this head, Sir J. L. Knight Bruce said that "the species or kind of the thing in which property was claimed had, of course, to be particularly considered in considering the question whether a right in it was invaded, and how invasion should, in the particular case, be prevented or redressed; and this class of property, by nature, not corporeal at all, or not exclusively corporeal, required to be defended against incorporeal attacks, and not at all, or not exclusively, against bodily assaults. Upon the principle, therefore, of protecting property, it is, that the common law, in cases not aided or prejudiced by statute, shelters the privacy and seclusion of thoughts and sentiments committed to writing, and desired

by the author to remain not generally known." (2 De G. &
Sm. 695.)

Except so far as independent equities may have been ac-
quired by strangers, literary proprietorship of the subject of
a limited publication is, therefore, not less entitled than a
private easement in land to judicial protection. That the sub-
ject, in the former case is personal property, but an easement
real property, does not affect the truth of this remark. (See
2 Eden, 329.)

Effects of a *general* publication will next be considered.
All the specific effects of such a publication, as dependent
upon its different modes, may be exemplified in the case of
a dramatic literary composition.

Under this head, the practical question is whether, after
such a publication, others than the author and his assigns may
lawfully *republish,* in print, or theatrically.

The purpose of the statutes for the protection of literary
proprietors is to restrain the rights of others to republish.
The cases to which these laws apply have been specified under
a former head. We have seen that, in the present case, the
rights of the public are unaffected by any legislative re-
striction.

We have also seen that, as the play in question was never
printed, the complainant, as its literary proprietor, could have
sustained her suit if the defendants' theatrical representation
had not been preceded by her own. This is undisputed. The
question is upon the effect of her own previous public perform-
ance of the play. This performance was, on her part, an act
of *general* publication. The question to be considered is two-
fold: first, whether this theatrical publication by her, if it had
been the means of enabling the defendants fairly to bring out
the play at their theatre, would have defeated her suit; secondly,
whether, as this publication was not thus the means of enabling
them to do so, they can take advantage of it in order to defeat
the suit.

Upon the first question the law was formerly involved in

doubt, but is no longer uncertain. An opinion upon it has already been expressed, without any particular statement of the reasons. In the absence of legislation, when a literary proprietor has made a general publication in any of the modes which have been described, other persons acquire unlimited rights of republishing in any modes in which his publication may directly or secondarily enable them to republish. Therefore, the literary proprietor of an unprinted play cannot, after making or sanctioning its representation before an indiscriminate audience, maintain an objection to any such literary or dramatic republication by others as they may be enabled, either directly or secondarily, to make from its having been retained in the memory of any of the audience. We have seen that the manager of a theatre may prevent a reporter from noting the words of such a play phonographically or stenographically or otherwise. As one of the audience, he would, in doing so, transgress the privileges conceded in his admission. But the privileges of listening and of retention in the memory cannot be restrained. Where the audience is not a select one, these privileges cannot be limited in either their immediate or ulterior consequences.

If purchases of manuscript plays, from the earliest periods of theatrical representations, have recognized the literary proprietorship of such compositions as existing until their public performance, we find no trace of any recognition of the continuance of *exclusive* rights in dramatic authors or their assigns after such publication. Among the ancients, the knowledge of polite literature was acquired, and literary tastes were cultivated, not less by attendance at recitations of the bard and the rhetorician, and at representations of theatrical performances, than by reading such few copies of works of established reputation as were accessible. The knowledge thus acquired, and the tastes thus developed, were no longer the exclusive property of the author and his assigns. When a dramatic or other composition, in verse or in prose, had been performed, recited, or sung, to a public assembly, every one of the audience was at liberty to publish elsewhere, at all times, as much of it as he

might be able from recollection to write or to repeat orally. Neither the author, nor those who, by his consent, had first published it, could reclaim it or limit the extent or effect of its primary publication. It might, afterwards, be represented, said, or sung, at will, by other persons, to other audiences, in the same place, or elsewhere. In 1773, Judge Boswell (Lord Auchinleck,) in the Scotch Court of Session, after observing that anciently very valuable performances were preserved only by the memory, and, referring to the cases of Homer and of Ossian, said that, within his own remembrance, the ballad of Chevy Chase had been repeated by everybody. (Boswell's Report of Hinton v. Donaldson, p. 5.)

Two plays, The Agreeable Surprise, first performed in 1781, and The Young Quaker, first performed in 1783, which were afterwards the respective subjects of two reported English cases, had been transferred by O'Keefe, their author, to the proprietor of the Haymarket Theatre. The assistance of Mr. Allibone, whose forthcoming second volume of the Dictionary of Authors will contain a notice of O'Keefe, enables me to state that at a much later period than the date of the last of the two reported cases, neither of these plays was contained in any list of regular dramatic publications. (See Gent. Mag., Apr., 1833, p. 376; and Jones Contin. of Baker & Reed's Biogr. Dramat. Tit. O'Keefe, where N. P. signifies not printed.) O'Keefe, in his "Recollections," published after the date of the last of them, states that the plays had "been repeatedly printed and published *surreptitiously*," meaning, without his leave, or that of the party to whom he had transferred them. They were not printed among his dramatic works, also published long after the same date. Thus they never were authorizedly published in print. O'Keefe, with the permission of the proprietor of the Haymarket Theatre, sold a copy of The Young Quaker to the manager of a Dublin theatre, for the express or implied purpose of enabling him to represent it there. A Dublin bookseller printed and published it in 1784, probably from this copy. There is in the Philadelphia Library (D. 4806, (5)) a copy of this edition, which appears to have been issued in the form

of a book printed for general circulation.   From the legal re-
ports of the two cases, both very obscure, we cannot infer that
either of the plays was judicially known to have been printed.
The manager of a theatre at Richmond performed The Agree-
able Surprise, without the consent of the proprietor of the Hay-
market Theatre, who sued him for the penalty imposed by
the statute, (8 An. c. 19,) for an unauthorized publication.
The case was decided in 1793.   The author, as he states in
his Recollections, was examined as a witness on the trial, which
was before Lord Kenyon.   The only evidence which appears
to have been given was the proof of his authorship, of his
transfer to the plaintiff, and of the representation by the de-
fendant.   The fact that it had been printed, probably, was not
in evidence.   But the previous frequent theatrical representa-
tions of it by the plaintiff during many successive years was,
doubtless, either proved or admitted.   The verdict having been
in his favor, his counsel, on a motion for a new trial, argued
that there had been "sufficient evidence for the jury to conclude
that the work had been printed, for it could not be supposed
that the performers could, by any other means, have exhibited
so perfect a representation of the work."   This point was not
decided.   The verdict was set aside on the ground that the only
publication by which the statutory penalty could be incurred
was a *publication in print*.   But Buller, J., said: "Reporting
(qu: *repeating*) anything *from memory* can never be a publi-
cation within the statute.   Some instances of *strength of mem-
ory* are very surprising.   But the mere act of *repeating* such
a performance cannot be left as evidence to a jury that the
defendant had pirated "the work itself." (Coleman *v.*
Wathen, 3 D. & E. 245.)   The case as to The Young Quaker
did not occur until the year 1820, when an intended perform-
ance of it at the English Opera House was announced by an
advertisement at London.   The proprietor of the Haymarket
Theatre, to whom the author had transferred it in 1783, had
been succeeded by other proprietors, who filed a bill in chan-
cery and applied for an injunction to prevent the performance
at the Opera House.   The application was heard *ex parte*

before Lord Eldon, who, after a difficulty in showing the
derivation of the complainant's title had been partially removed,
granted the injunction. (Morris v. Kelly, 1 J. & W. 461.)
That the play had been publicly performed for more than a
third of a century by themselves, and those under whom their
title was derived, must have appeared. The report, however,
states neither this fact, nor on what ground the injunction was
asked or granted. Whether the bill was founded on an as-
serted general right of literary proprietorship, or on the de-
fendants' intended use of a copy of the edition improperly
printed in Dublin, or on any and what other assertion of right,
can only be conjectured. According to the previous decision
in the case of The Agreeable Surprise, Lord Eldon cannot
have granted this injunction, as to The Young Quaker, on any
assumed foundation of a statutory right in the complainant.
In a subsequent case, a complainant had the copyright of Lord
Byron's tragedy of Marino Faliero, and had printed and pub-
lished it for sale, when, without his, or Lord Byron's permis-
sion, the defendant represented it theatrically in a curtailed
form, under the designation of an abridgement. Lord Eldon
sent the case to the King's Bench for an opinion upon the ques-
tion whether the plaintiff could maintain an action against the
defendant for publicly representing the tragedy thus abridged.
The Court certified its opinion in the negative. The case does
not appear to have been determined on the ground that the
abridgement was a fair one, but upon the ground, heretofore
stated, that under the only statute of copyright then in force
in England, a proprietor of a dramatic literary composition,
after a general publication in print, had no redress for an un-
authorized theatrical representation. The counsel, on oppo-
site sides, referring to the case of The Agreeable Surprise,
which play they conceded to have been acted only, and not
printed, called it a different or converse case. This case of
Marino Faliero was in 1822. (Murray v. Elliston, 5 Barnw,
& Ald. 657; see the remarks upon the case in 12 Ad. & El. N.
S. 236.)

In an action by the literary proprietor of a play for an un-

authorized theatrical representation of it, if the whole evidence consisted in proof of his proprietorship, his own public theatrical representation of it, and a subsequent performance of it by the defendant, the legal presumption, according to the dictum of Buller, J., would be, that the impression of the plaintiff's own performance upon the memory of his own audience had been, directly or secondarily, the means of enabling the defendant to perform the play. The expression by Buller, J., of this opinion, was altogether extrajudicial. It, probably, was contrary to the opinion of Lord Kenyon, acted upon at the trial.

Such a question of evidence is, perhaps, of little practical importance in a Court of Equity, where a discovery of the means by which a defendant has been enabled to represent a piece theatrically can always be obtained. Thus, in the present case, we know that the complainant's previous performance of the play in question was not the means of enabling the defendants to bring it out at their theatre. The trial of such a question at law must always be, more or less, difficult. But the rule of evidence, as Buller, J., stated it, seems to be dependent upon reasons which, though, perhaps, anciently sufficient, are, according to modern usages, almost obsolete. That a theatrical performance at one theatre can enable performers at another to repeat a play, word for word, or nearly word for word, must often be too improbable for rational credence. Therefore, when a plaintiff has proved his own literary proprietorship, and the conformity of the two representations, the burden of proof ought, perhaps, in an ordinary case, to rest upon the defendant. When like evidence has been adduced in an action by the patentee of an invention, the burden of proof is usually thus cast upon a defendant. When an unprinted play has, for many years, been so frequently performed as to render it familiar to the dramatic profession and to constant attendants at the theatre, a defendant may be able to relieve himself of such a burden by proving that the means of performing it were fairly derived by him from its previous public representation. The law certainly recognizes the possibility that this may occur. Its occurrence may, perhaps, not have been even improbable

in the particular case of The Agreeable Surprise. But this would not establish any such rule of evidence as that which Buller, J., is reported to have stated. If Lord Eldon had followed such a rule, he could scarcely have made the order for an injunction in the case of The Young Quaker. But, independently of the mere question of evidence, the doctrine of the dictum of Buller, J., as to *repetition from the memory of the audience,* may be regarded as established.

At the dates of these decisions, opinions were divided on the more important question, whether a literary proprietor had, independently of legislation, a perpetual copyright. In England, a majority of the judges of the King's Bench decided, in 1769, that such a proprietor had, at the common law, a copyright, through which, notwithstanding his own general publication in print, he retained the perpetual exclusive right of republishing. (4 Burr. 2303.) This decision was in opposition to the views which seem to have been prevalent on the continent of Europe, where, however, the subject was obscured, as it had formerly been in England, by the prevalence of the systems of censorship, and of governmental grants of exclusive printing privileges. A decree in Chancery made in another case, conformably to the decision in the King's Bench, was reversed by the House of Lords in 1774, upon the ground that the copyright, if it existed at the common law in perpetuity, was limited in its duration by the statute, 8 An. c. 19. But, in the House of Lords, the opinions of the judges were taken; and, upon the question, as it would have stood if unaffected by the statute, a majority of them concurred in the previous opinion of the majority of the judges of the King's Bench. (17 Cobb. Parl. Hist. 953 to 1003; 2 Br. P. C. by Toml. 129; 4 Burr. 2408 to 2417.) In the meantime, however, in 1773, the contrary opinion had been expressed by the Scotch Court of Session, in a decision concurred in by twelve of thirteen judges present. (Hinton v. Donaldson, Boswell's Report.) An objection to the opinion of the majority of the English judges was, that preventing republication, without the

former literary proprietor's consent, would enable him, at pleasure, to suppress that which had been authorizedly published. To this objection some of these judges had answered, as we have seen, that the continuance of his exclusive right was dependent upon an implied condition that he should keep always in the market an adequate supply of printed copies for sale at reasonable prices. That no such condition could legally be implied has already been fully shown. The objection, therefore, was not sufficiently answered. The opinion of the majority of the judges, or of some of them, was thus founded, in part, upon an erroneous doctrinal assumption. There was, in law, no middle position between two extreme opposing opinions. One of them was that a literary proprietor, notwithstanding an authorized unrestricted publication, retained an unqualified right, indefinite in its duration, enabling him, at pleasure, to sell or to republish on his own terms, or arbitrarily to suppress both sale and republication. The Court of King's Bench had, in effect, so decided. The other, and contrary, opinion was, that, in the absence of legislation, an unrestricted circulation of a printed copy dedicated the composition irrevocably to the public, for every such use, including republication, as could be made of such copy. The Supreme Court of the United States, in 1834, adopted the latter opinion. (8 Pet. 591; see 17 How. 454.) Opposing views of the question had, until then, been entertained. Opinions upon it, in England, continued to differ until 1854, when the preponderance of authority was there determined, conformably to the opinion of the Supreme Court of the United States. This preponderance was thus determined in England by the concurring opinions of Lords Cranworth, Brougham, and St. Leonards, in the House of Lords, against the views which a majority of the judges of the courts of law again expressed. (4 H. L. Ca. 815, reversing 6 Exch. 592, and affirming in principle, 4 Exch. 145, and compare 12 Com. B. 187 with 17 Com. B. 444.)

In cases not legislatively provided for, the public circulation of a literary composition thus authorizes any person to repub-

lish it from any copy so circulated. If it is a dramatic composition, it may be republished either by reprintng it, or by theatrical representation. If we now recur to the case of a dramatic composition which, though unprinted, has been publicly represented on the stage, we will see that the principle applicable must be the same, so far as this representation of it may have been the means of enabling ulterior publication to be made. This brings us to the conclusion, already stated, that if the complainant's previous representation of the play in question had been the means through which the defendants were fairly enabled to represent it, the present suit could not be maintained.

But the complainant's own representation of it was not the means of thus enabling them to represent it; and the final question, which is now reached, is, whether, under such circumstances, the mere fact that she had publicly performed it is to defeat her suit. This proposition is resolvable into the question already stated, whether a literary proprietor who has published in any of the modes above described as *general*, does not afterwards retain his proprietary rights, except so far as, by thus publishing, he may enable others to make ulterior publication, or otherwise to use the composition.

All reasons founded in legal analogies require that such an ultimate proprietary dominion should be thus retained by an author and his assigns. The general doctrine of proprietary right is exemplified in a landowner's retention of his ultimate proprietorship after his dedication of the most unlimited easements to the public. A literary proprietor's retention of a resulting interest after such a publication is perfectly compatible with every other person's unlimited right of republishing, and otherwise using unrestrictedly, that which has been published. In cases which may be stated, a denial of the continuance of such a resulting interest would seem almost, if not quite, absurd. The sale of a single copy only of a first edition of a book is a general publication. In

such a case, if its literary proprietor has possession of all the other copies and of the manuscript from which they were printed, and, wishing to suppress the publication, buys back the copy sold before it has been read, he must stand on the same footing as if he had never parted with it. That, before he got it back, the purchaser may have read it, can make no rational difference, unless the impression on the latter's memory may enable him to make ulterior publication. The supposition of a less extreme case is not required in order to prove the necessity for the retention of a resulting literary proprietorship. In England, the Statute 5 and 6 Vict. c. 45, § 18, enacted that when the proprietor, etc., of any encyclopædia, etc., had employed, or should employ, any persons to compose any articles, or portions thereof, on the terms that the copyright should belong to such proprietor, etc., the copyright therein should be his property, and that he should enjoy the *same rights* as if he were the *actual author*, and should have such term of copyright therein as was given by the act to the authors of books. Notwithstanding this enactment, the proprietor of an encyclopædia, who employs a person to write an article for publication in it, and pays him for the article, cannot, in England, without the writer's consent, publish the article in a separate form, or otherwise than in the encyclopædia, unless it was written on the terms that the copyright in it should belong, *for all purposes*, to the proprietor of the encyclopædia. Shadwell, V. C., in so deciding said that the *original composer* of the article had the copyright in it, *except so far as he parted with it*, and that no reservation was necessary to constitute a right in him. (16 Sim. 196, 198.) The reasoning is not less applicable in the present case than if the proprietary right now in question were statutory.

If the principle in question exists, it must apply to such representations of an unprinted play as are not the means of enabling ulterior dramatic or literary publication to be made. In Macklin *v*. Richardson, the complainant was the author of the farce, in two acts, called Love à la Mode, which had

never been printed, but had been several times performed, with his permission, during six years. He received a compensation for giving such permission, and never permitted the manuscript to be out of his control, always taking it back so soon as the performance of the piece was finished. The defendants, proprietors of a monthly journal, employed a short-hand writer to report the words of this play, by taking them down from the mouths of the actors during its performance. When this had been done, one of the defendants, from his memory, corrected this reporter's notes, and published the first act in their journal, for April, 1766, with a notice that the second act would be published in the next monthly number. The complainant having filed a bill in Chancery for an account and injunction, Lord Northington granted an injunction till answer, which was afterwards continued by him until the hearing. When the cause afterwards came on for a hearing before Lord Camden, the case in the King's Bench, afterwards decided in 1769, upon the question of copyright at common law, was pending in that Court. Lord Camden ordered the cause to stand over until the determination of that case. After its decision, the cause in Chancery was again heard in 1770, when the injunction was made perpetual by the Commissioners of the Great Seal. It had been argued that the previous representation of the farce on the stage was a publication "which gave a right to any of the audience to carry away what they could, and make any use of it," and that the printing it was, therefore, no injury to the complainant. But Lord Commissioner Smythe said that this was a mistake; for, besides the advantage from the performance, the author had another means of profit, from the printing and publishing, and that there was as much reason that he should be protected in that right as any other author; and Lord Commissioner Bathurst said that printing it before the author had printed it was doing him a great injury. (Ambl. 694; 17 Cobbett Parl. Hist. 1094.) It can scarcely be necessary to refer to Morris v. Kelly, (1 J. & W. 461,) or any other case, to show that, on the principle of this decree, the per-

formance of Love à la Mode at another theatre, from the short-hand writer's report, would have also been prevented by an injunction.

As the decision in the King's Bench, which preceded the final decree in Macklin *v.* Richardson, has been overruled in England by the subsequent cases in 1774 and 1854, in the House of Lords, it is not altogether unimportant that the prior injunction had been granted and continued by Lord Northington in 1766, before the decision in the King's Bench. Lord Northington's views differed so far from those of the Court of King's Bench, that he had, in 1765,* dissolved the injunction in the very case decided by that Court in 1769.† He, therefore, in continuing the injunction in Macklin *v.* Richardson, must have been of opinion that a resulting literary proprietorship might continue in a dramatic author after a public theatrical representation. In 1849, Sir J. L. Knight Bruce, (2 De G. & Sm. 692,) referring to the cases of The Agreeable Surprise, (Coleman *v.* Wathen, 5 D. & E. 245,) and Marino Faliero (Murray *v.* Elliston, 5 B. & A. 657,) both of which have been fully noticed, said that neither of them was opposed to the decision in Macklin *v.* Richardson. He, therefore, must have considered it as a decision of authority. The authority of his opinion, in 1849, is not affected by the subsequent case in the House of Lords in 1854, because he very carefully avoided recognizing or acting upon the former views which that case overruled.

Macklin *v.* Richardson, if to be followed as an authority, is decisive of the present case. A like remark might be made as to Morris *v.* Kelly. (1 J. & W. 461.) But, independently of these authorities, we have seen that legal reason and analogy are in favor of the existence of a resulting literary proprietorship in an author and his assigns, after a general publication, so far as this publication may not be the means of enabling ulterior publication to be made. Such a resulting proprietary dominion must, therefore, be retained in the case

* 2 Eden, 327.
† 4 Burr, 2303.

of a dramatic literary composition, unless the retention is repugnant essentially to some necessary consequence of a public theatrical representation. The resulting or ultimate proprietary right is defined so as to preclude the notion of any practical repugnancy. There can be no legal repugnancy, if the doctrine of the continuance of literary proprietorship after a qualified or limited publication can be maintained in *any* case whatever. If uses of literary property can be modified by restrictive conditions, its legal nature must be such that a literary proprietor's dedication to the public is also limited in its effects by the extent of the public use. The resulting literary proprietorship, after such a dedication, *might* continue, though a limited publication were impossible, but *must* continue, if the limited publication is, in any case, possible.

The remaining inquiry is, whether the particular doctrines which have been stated under these two specific heads, have, in any respect, been changed by the decision of the Supreme Court of the United States, in 1834, that copyright had no existence at common law, and the conforming English opinions in the House of Lords in 1854. In the United States, the doctrine of limited publication, as above defined, has, in its application to unprinted compositions, been authoritatively recognized, and its rules judicially enforced in cases which have occurred since 1834. (4 McL. 300; 2 Sto. Rep. 100; 4 Duer, 379, 382, 385; and see 14 How. 530, 531.) The general subject is one upon which judicial authority in the United States has led, rather than followed, the course of decision in England. The specific doctrine, as to limited publication, had been established in England, as applied to manuscripts, before the cases in the King's Bench in 1769, and the House of Lords in 1774. The same specific doctrine had been further developed in that country before the general subject was again considered in the House of Lords in 1854. In the case in the latter year, Lord Brougham succinctly and cautiously, but clearly, conceded the specific doctrine; and guarded it by the

restrictions required, in order to maintain its conformity to the principles which now determine the effect of a general publication. (4 H. L. Ca. 965.) His opinion in 1854, and that of Yates, J., in 1769, are the leading ones in support of these principles. (See 8 Pet. 655.) Yates, J., had stated the question to be, whether literary proprietorship existed in perpetuity after an authorized "general publication," using the phrase *general publication* in a sense very like that in which *dedication to the public* is ordinarily used, and conceding a literary proprietor's exclusive right of priority of publication, and his retention of the proprietorship of his *manuscript* after publication. (4 Burr. 2355, 2363, 2364, 2365, 2379, 2390, 2360.) As to the right of priority of publication, he thought that a literary proprietor had the sole right of judging whether he would make the contents "public, or commit them only to the sight of his friends," (p. 2379.) This was approaching as near to the definition of a *limited* publication as the case in question, which was confessedly that of a *general* publication, required. In the course of the same opinion, Yates, J., said that the effect of a publication, meaning of a *general* one, was irrevocable. A dedication to the public of an easement, where the dedicating proprietor's resulting dominion is retained, is likewise irrevocable. Therefore, the irrevocability of the public use of a composition which its literary proprietor dedicates to the public, is immaterial. The question is, whether, subject always to this public use, his ultimate proprietorship may not continue.

The principal argument of those who contended that there was a copyright at common law, was that if the exclusive rights of literary proprietorship were not maintainable after publication, a literary composition could not be used with any sufficient certainty of profit. That of which no profitable use of any kind is possible, cannot become a subject of proprietary right. The argument was, that literary proprietorship was not profitable, except through publication, and that if a first publication gave to everybody an immediate unrestricted right of republishing, the so-called literary property was not property

at all. The premises of this argument were not absolutely true, if a literary proprietor could, in any case, limit the effects of a publication by restrictive conditions, or if he retained, after a general publication, an ultimate proprietary dominion subject to the public use. The opponents of the argument contented themselves, however, with refuting it on the simpler ground that a literary proprietor's exclusive right of priority of publication sufficed alone to render the property of some value, notwithstanding the dedication to the public effected by an unrestricted circulation in print. (4 Burr. 2379; 8 Pet. 657.) The argument was, moreover, by some of its opponents retorted, so as to give to it an apparently self-destructive tendency. Thus, if its premises had been absolutely true, it would have extended so far beyond its intended purpose as entirely to defeat an author's claim to literary property before, as well as after, publication. In proportion as the argument appeared convincing or plausible, its tendency was towards this result. The consequence was that while those who made the argument pushed the claims of authors unreasonably far, one or more of its judicial opponents denied the existence of any literary proprietorship in the incorporeal composition even before publication. Other opponents of the argument, professing to deny only the continuance of literary property after publication, admitted its previous existence in so timid or imperfect a manner as might impliedly have excluded the recognition of a right of making qualified or limited publication in any case. This course of reasoning on opposite sides had a tendency to obscure distinctions which have, in the present case, required full development.

The argument thus apparently answered, by denials of its premises, was not quite refuted by such denials. Its premises, though not absolutely true, were so far, in a relative sense, practically true, that the argument might perhaps have prevailed if it had not encountered another answer.

The more decisive answer was that the foundation of the argument lay in a misconception of the character and extent of the rights of the public in the incorporeal contents of a

printed book which has been unrestrictedly circulated. (2 Wall, Jr., 564.) These rights may include that of republishing it more or less extensively. General readers, and particular students, have their own independent rights of using the knowledge of its contents, and of diffusing this knowledge in modes and for purposes of their own. Its literary proprietor may dislike the modes, or feel no concern in the purposes. He may have opposing interests, or feelings, or prejudices. The literary proprietorship may have been changed. Though the person may have been unchanged, his motives and opinions may have altered. The possibility that authors may desire to suppress their literary productions, and the probability that literary proprietors will sometimes publish in methods unwise, capricious, oppressive, or illiberal, have been judicially recognized. (2 Meriv. 438; 17 Cobb. Parl. Hist. 1000, 991; 4 H. L. Ca. 936; Boswell's Report of Hutton *v.* Donaldson, pp. 34, 35.) The protection of the rights of the public should not be dependent upon the arbitrary will of a literary proprietor, or upon the influence of any motives of self-interest by which he may probably be actuated. These rights of the public, including that of republishing, unless they are legislatively restricted, are not less absolute than his own. He should, therefore, after publicly circulating his composition, have no exclusive privileges except such as may have been legislatively conferred, or such as others may be incapable of exercising.

These were the views which prevailed in the United States, and, ultimately, in England. In reviewing the authorities, it must be remembered that the word *publication,* when unexplained, almost always means a *general* publication. Thus Yates, J., and other judges, have described the effects of publication in the cases of an invention and a literary composition as alike. Here the meaning intended was that the right of public use consequent upon a dedication to the public was, in each case, irrevocable and unrestricted. (4 Burr. 2360, 2361, 2386, 2387. See 2 De G. & Sm. 696.) This doctrine was perfectly true. The statement of it in a case in which the

publication was confessedly general, required no discrimination to be made in consequence of the intrinsic distinguishableness of a literary composition as the production of an author who is or may be known. We have, however, seen that this intrinsic distinguishableness may prevent a properly restricted publication of a literary composition from becoming a dedication to the public, and that such a composition is different, in this respect, from an invention, because the authorship and novelty of an invention require extrinsic attestation. The doctrine stated by these judges implied no exclusion of such distinctions where these differences exist. A limited publication, though not possible in the case of an invention, may therefore, be recognized as quite possible in that of a literary composition. The retention of any resulting dominion over an invention after it has been published may be likewise incompatible with effects of its publication. We have, however, seen that no such incompatible effects ensue from the general publication of a literary composition; but that, on the contrary, the subsequent retention of such an ultimate dominion is a legitimate incident of literary proprietorship.

Since Macklin v. Richardson was decided, ninety years ago, no case except the obscurely-reported one of Morris v. Kelly, exemplifying this doctrine, has occurred. The unsettled condition of the law of literary property at the dates of those cases, the obscurity in which its doctrines have until a recent period been involved, and the difficulty of applying practically the metaphysical reasoning upon the subject in the books, have rendered an extended investigation of it necessary. The conclusion deduced, under this head, is, that, as the complainant's prior theatrical publications were not the means of enabling the defendants fairly to bring out this play at their theatre, she is, on the ground of literary proprietorship, entitled to a decree. These views are, I think, warranted by those of this court in the case reported in 2 Wallace, Jr., 547. But if the decision of the cause depended on this point alone, I would not make such a decree without a reargument in the presence of the Circuit Judge.

The case recapitulated stands thus : The complainant having the literary proprietorship of this comedy, but no statutory copyright in it, and having publicly performed it at her theatre, with an intention to continue its public performance there, the defendants, against her will, performed it repeatedly at their theatre, without having been, directly or secondarily, enabled so to do through its impression upon the memory of any of her audience.   This was an infraction of a proprietary right retained by the complainant.   Independently also of such right, she is entitled to redress, because the defendants enabled themselves to represent the play by knowingly taking advantage of a breach of confidence committed by a person in her employment.

If an issue should be asked by either party within ten days, it will be ordered.   A special venire may be directed, and the proceeding regulated by suitable orders.   Among them should be one that the depositions hitherto taken may be read by either party on the trial.   The proper pecuniary measure of the redress to which the complainant is entitled, is the fair value, in November, 1858, of a copy of the play as performed at her theatre, with such a license, authorizing its performance at the defendants' theatre, as she was, according to the foregoing views, able to give.

If a jury should find, or a master should report, a sum exceeding, with costs, the fund in deposit, and the report or verdict should be approved, no final decree will be made until after a reargument, before a full court, of the questions—first, whether the complainant is entitled to any decree on the ground of literary proprietorship, and if not, then, secondly, whether on the ground of breach of confidence, any other than merely preventive redress could, independently of the payment of money into court, have been administered in the case.

If a report or verdict for a less amount should be confirmed, a final decree may be made without a decision of either of these two questions.

Since the foregoing opinion was written, I have seen a re-

port of a decision of Judge Sprague, in a case of Roberts v. Myers,* awarding a preliminary injunction to prevent the unauthorized theatrical representation of a play which was the subject of a copyright under the acts of Congress. There had been a public theatrical representation of it before the adoption of measures to secure the statutory copyright. He was of opinion that, whatever might have been the effect of a prior publication in print, the prior theatrical performance had not been such a publication as deprived the literary proprietor of the play of the benefit of the dramatic author's copyright act of 1856. Judge Sprague was also of opinion that this proprietor was entitled to the benefit of the copyright acts, though the play had never been printed, and that he might sue in equity, though he was only an assignee for a limited period of the exclusive right of dramatic representation, and though certain places were excepted from the operation of the assignment on which his title depended. On a question of the proprietorship of a dramatic literary production alleged to have been composed by an agent for his employer, the case was, in all essential particulars, the reverse of the present case. The views of Judge Sprague, so far as applicable to the case now before me, are confirmatory of those which I have expressed, though, as frequently occurs under this head of doctrine, the relative uses of such words as *publication,* etc., may differ somewhat, as their practical applications vary.

DECREE.—This cause having been heard upon the pleadings and proofs and admissions, and argued by counsel, and considered by the court, it appearing that the complainant's literary proprietorship of the comedy in question is derived from a non-resident alien author, the court is of opinion that the complainant has no copyright therein or statutory right of exclusive dramatic representation thereof. But, upon the points involved in the question whether, independently of the statutes in that behalf provided, the complainant is entitled to relief, the court is of opinion, that, as the said comedy has not been

* 23 Law Reporter, 397.

printed, and has never been published otherwise than by theatrical representation, and as the complainant's own theatrical representations of it were not the means through which the defendants were fairly enabled to represent it, their unauthorized theatrical representation of it was such an infraction of rights of the complainant as entitles her to relief. The court is further of opinion that the proper pecuniary compensation for her indemnity in the premises, is the value of such a license under her hand and seal, accompanied with a fairly written copy of the said comedy, as would have authorized and enabled the defendants, after adequate preparation, to bring out the said comedy at their theatre on the 22d of November, 1858, and represent it then, and afterwards, without restriction or limitation, as it was, then and afterwards, there performed.

It is ordered that either party have leave to apply, within ten days hereafter, for an issue to find the value of a license and copy such as aforesaid.

The cause is referred to the master, to inquire and ascertain the difference between the average profits, at such a theatre, of performances of old or well-known plays, and popular new plays, and to report the nightly profits of the actual performance of the comedy in question, at the said theatre, and the number and dates of its performances there; with authority to examine witnesses and parties, and order and compel the production of books, accounts, and other papers, and return such material answers or deposition as either party may request him to return.

If no issue shall have been ordered, the master will report further the pecuniary value of a license and copy such as aforesaid. In ascertaining this value, he will take into consideration, so far as it may benefit the defendants, the price which the complainant asked for such a license when she asserted that she had a statutory copyright.

It is directed that if an issue shall be tried, all or any depositions hitherto taken in the cause may be read, on the trial, by either party, subject to the same objections as if the re-

spective deponents had been offered for oral examination as witnesses. And it is further directed that, if such an issue shall have been ordered, the master, so soon as he shall be able to report, in such manner and form as may facilitate the trial thereof, those matters of which the discovery may, in his opinion, be material to either party, for the purposes of such trial, shall report the same accordingly; confining his report, where both parties do not request the contrary, to such matters of account, or of detail, as cannot be investigated at such a trial without inconvenience, or undue delay.

THE MASTER having reported, under the reference in the above decree, a final decree was made as follows:

And now, April 4th, 1861, this cause having come on to be heard at a former term, and having been argued by counsel and considered by the Court, and having been, to wit, on 26th November, 1860, referred by the Court to Charles F. Heazlitt, Esq., as master, to enquire and ascertain as in the decree of the Court is specified, and the said master having, on the 9th of March, 1861, filed his report, and neither the said complainant nor the said defendants having by their respective solicitors excepted to the said report.

It is thereupon, on consideration thereof, ordered, adjudged, and decreed by the Court that the said report of the master be confirmed absolutely, and that the complainant do recover against the defendants the sum of five hundred dollars ($500), reported by the said master as the proper pecuniary compensation for the indemnity of the complainant for the unauthorized theatrical representation by the said defendants of the comedy called Our American Cousin, in said pleadings mentioned, and that the complainant do further recover from the defendants her costs of this suit.

And it is further ordered, adjudged, and decreed that the said sum of five hundred dollars ($500), together with the said costs (including the master's fee) be paid by the clerk of this court out of and from the sum of fifteen hundred dol-

lars ($1,500) deposited by the defendants in this court under the former decree of this Court dated December 16th, 1858, and that the residue of said fund be repaid to the defendants.